457 F.Supp. 335 (1978)
Francine L. CULLARI, Plaintiff,
v.
EAST-WEST GATEWAY COORDINATING COUNCIL, Defendant.
No. 76-1108C(3).
United States District Court, E. D. Missouri, E. D.
September 18, 1978.
Mary Anne Sedey, Anderson, Everett, Sedey & VanAmburg, St. Louis, Mo., for plaintiff.
Edward E. Murphy, Jr., Murphy-McCarthy Associates P. C., Clayton, Mo., for defendant.

MEMORANDUM
NANGLE, District Judge.
Plaintiff Francine L. Cullari brought this suit pursuant to 42 U.S.C. § 2000e et seq. *336 alleging discrimination on account of sex. Plaintiff seeks damages in the form of back pay and an award of attorney's fees and costs.
This case was tried to the Court sitting without a jury. After consideration of the pleadings, the evidence adduced, the documents submitted, the stipulations of the parties, and being otherwise fully advised in the premises, the Court hereby makes the following findings of fact and conclusions of law in accordance with Rule 52, Federal Rules of Civil Procedure:

FINDINGS OF FACT
1) Plaintiff Francine L. Cullari is a female citizen of the United States who at all times relevant hereto was a resident of the state of Missouri. Defendant East-West Gateway Coordinating Council is a not-for-profit corporation doing business in the state of Missouri. Defendant is an employer engaged in an industry affecting commerce and has employed at least 25 employees at all times relevant to this action.
2) Plaintiff was employed by defendant from April 26, 1971 to September 26, 1974. Plaintiff received a Bachelor of Science degree, with a major in sociology, from Chestnut Hill College, Philadelphia, Pennsylvania, in June, 1968. Plaintiff attended the New School for Social Research in New York, New York, from September, 1968 to June, 1969. She completed four courses toward a Master of Arts degree in sociology but no degree was obtained from the New School for Social Research. Plaintiff received a Master of Arts degree in urban affairs from St. Louis University, St. Louis, Missouri, in May, 1974.
3) Prior to her employment with defendant, plaintiff worked as a social worker at the New Jersey Bureau of Children's Services, Trenton, New Jersey, from June, 1968 to September, 1969 at a salary of $550.00 to $649.00 per month. Plaintiff worked as a planner for Planners Associates, Inc., Newark, New Jersey, from October, 1969 to April, 1970, and from October, 1970 to January, 1971 at a salary of $600.00 per month. At Planners Associates, plaintiff was responsible for an economic base study for Essex County, New Jersey; included was study design, data collection and analysis, writing and supervision of other employees.
4) Plaintiff was employed by defendant as a Research Assistant II from April 26, 1971 to September 1, 1972. From September 1, 1972 through August 1, 1973, plaintiff was employed as an Assistant Planner II. From August 1, 1973 to September 26, 1974, plaintiff was employed as a Planner I.
5) Plaintiff's rates of pay were as follows:

 April 26, 1971 $613.00 per month
 June 1, 1971 $621.00 per month (cost of living
 increase)
 December 1, 1971 $634.00 per month (cost of living
 increase)
 May 16, 1972 $666.00 per month (merit increase)
 June 1, 1972 $667.00 per month (cost of living
 increase)
 September 1, 1972 $700.00 per month (merit increase)
 December 1, 1972 $716.00 per month (cost of living
 increase)
 August 1, 1973 $769.00 per month (merit increase)
 December 1, 1973 $806.00 per month (cost of living
 increase)
 June 1, 1974 $842.00 per month (cost of living
 increase)
 July 1, 1974 $974.00 per month (merit increase).

At all times while employed by defendant, plaintiff performed her assignments competently. She received an excellent formal evaluation; no area for improvement was noted thereon.
6) When first hired, plaintiff worked on a project concerning the identification of developers interested in pre-fabricated housing. Plaintiff did some writing and editing on the report; additionally, she attended a conference which she helped to set up. Plaintiff then worked for Alan Berg, then deputy director of defendant, on a number of projects including a drug abuse study, and a study of commercial vacancy rates. In September, 1972 plaintiff worked for Alvin Boudreaux and worked on a population projection study. This required the development of methodology, and collection of data. Plaintiff calibrated the test. While working on this project, plaintiff was classified as an assistant planner. Planners, with a higher salary, were working *337 under plaintiff's supervision although nominally under the supervision of plaintiff's superiors. Plaintiff experienced almost no day-to-day supervision while doing this study. Plaintiff also worked on land use, general revenue, and economic research while working for Boudreaux. Plaintiff next worked under the supervision of Leroy Grossman, in the housing section. Plaintiff finished a study on financing housing. Later, she wrote a report on housing and finance. Plaintiff was told in February 1974 by Alan Richter, who had replaced Berg, that he wanted plaintiff to continue with housing under a contract with the Department of Housing and Urban Development. At that time, there was no one else at defendant working on housing and plaintiff had no direct supervision. In March, Wallace Altes became director of general planning and was plaintiff's supervisor; nonetheless, plaintiff was not supervised on a daily basis. In March, 1974 Timothy Barry who had been working with a Housing Task Force, was transferred into the housing department and shared an office with plaintiff. While working in housing, plaintiff was involved in gathering model legislation for fair housing legislation; researching state legislation on redlining including the drafting of legislation and the representation of defendant Gateway at a meeting of the Board of Aldermen; exclusionary zoning research; reviews of A-95 reports; preparation of quarterly progress reports to federal agencies; negotiation and monitoring of a subcontract; preparation with Barry of a position paper on § 8 public housing; and the gathering of materials and establishment of a meeting on high risk rehabilitation funds. In addition, in 1974, plaintiff and Barry attended a conference in Kansas City, Missouri concerning the Housing Community Development Act. Plaintiff was also responsible in 1974 for the hiring of another individual for the housing department. Plaintiff was commended by each of the individuals who supervised her work.
7) Plaintiff complained about her salary on numerous occasions. In April, 1971 plaintiff complained to Berg who told plaintiff that the budget would not allow a higher salary. In July, 1971, plaintiff discovered that the budget was in fact being underspent. Plaintiff against asked Berg for a higher salary. Berg said that he had hired plaintiff at a lower salary because he did not know if she would stay. Berg said that he would have to justify a higher raise with some significant work and asked plaintiff to think of something significant. In May, 1972 plaintiff met with Eugene Moody, Executive Director, who said that he did not like to give large raises but would give plaintiff one-step raises every three months until her salary was equitable. In August, 1972 plaintiff told Berg that three months had passed and that her next raise was due. Eventually, that raise was received. In December, 1972 plaintiff complained to Boudreaux because she had not received her next three-month raise. In the course of that discussion, plaintiff asked why another individual had been hired at a salary similar to plaintiff's although this individual had less experience. Boudreaux said that the reason was that this individual had a wife and two children. In June, 1973 plaintiff asked Grossman to supervise her work more closely so that Grossman could recommend plaintiff for a raise. Plaintiff stated at that time that if she did not get a raise she would file a charge with the Equal Employment Opportunity Commission. On the following day, plaintiff received a raise and a promotion to Planner I. In February, 1974 Richter initiated a conversation with plaintiff in which he said that plaintiff was underpaid. Richter said, however, that he was unable to do anything about it until the new fiscal year in July. In May, 1974 plaintiff was called into Richter's office; Richter said that he had a list of employees, their education, salary and responsibilities, and that plaintiff was the one glaring inequity. In May or June, 1974 plaintiff met with Altes concerning salary. Plaintiff asked for $14,000.00 to $15,000.00 per year. Altes said that he would recommend a raise of $350.00 per month. Soon after, Altes said that after a conversation with Richter, it was decided to offer plaintiff a raise of *338 $132.00 per month. A few days later, plaintiff met with Altes and Richter about the $132.00 raise. Richter said that another raise would be considered in six months. Plaintiff then advised them that she had filed a charge with the Equal Employment Opportunity Commission.
8) In September, 1974 plaintiff submitted her letter of resignation. From the evidence adduced, the Court finds that plaintiff decided voluntarily to resign her position at defendant.
9) Plaintiff filed a charge with the Equal Employment Opportunity Commission on June 25, 1974. A Right-to-Sue letter was issued on September 2, 1976 and this suit was timely filed.
10) Wayne Weidemann starting working for defendant in the fall of 1969. He started in a temporary position, receiving a permanent position a few months later. It was Weidemann's first job after college. Weidemann received a Bachelor of Arts degree, majoring in geography, from Southern Illinois University, Carbondale, Illinois in 1967. He received a Masters of Arts Degree in geography from Southern Illinois University, Carbondale, Illinois in 1969. Weidemann was a Statistian II from September 24, 1969 through January 1, 1970. He was a Planner I from January 1, 1970 to August 16, 1971 and was a Planner II from August 16, 1971 to March 22, 1974. Weidemann received the following rates of pay:

 September 24, 1969 $565.00 per month
 December 1, 1969 $582.00 per month (cost of living
 increase)
 January 1, 1970 $673.00 per month (merit increase)
 June 1, 1970 $690.00 per month (cost of living
 increase)
 August 1, 1970 $760.00 per month (merit increase)
 December 1, 1970 $782.00 per month (cost of living
 increase)
 December 1, 1970 $822.00 per month (merit increase)
 June 1, 1971 $833.00 per month (cost of living
 increase)
 August 16, 1971 $873.00 per month (merit increase)
 December 1, 1971 $892.00 per month (cost of living
 increase)
 May 16, 1972 $973.00 per month (merit increase)

When hired, Weidemann worked on population projections and employment projections. He helped develop the model for the projects and wrote sections of the reports. He also did some public presentations with the assistance of Boudreaux. In 1970, 1971 Weidemann worked with a consultant on an industrial expansion project. Weidemann worked with the consultant in designing the study and in writing the report. In 1970, Weidemann also worked on a regional development plan; Weidemann prepared portions of the report. In 1971, Weidemann worked on a socio-economic impact study of rapid transit; the report was written by a consultant. He also worked on a water pollution study concerning St. Louis County, in which he worked with consultants, monitored schedules, reviewed reports, shared the writing and collected some raw data.
11) Robert Watson was employed by defendant from November 2, 1971 to November 11, 1977. Watson had received his Bachelor of Science Degree, majoring in civil engineering, from Washington University, St. Louis, Missouri in 1970. Watson received his Master of Science Degree in civil engineering, majoring in transportation engineering from Northwestern University, Evanston, Illinois in 1971. During his employment with defendant, Watson was a Planner I from November 2, 1971 to December 1, 1972. He was a Planner II from December 1, 1972 to November 1, 1974. From November 1, 1974 to September 1, 1976 Watson was a Planner III. From September 1, 1976 to March 1, 1977, Watson was a Transit Planner. From March 1, 1977 to the date of trial Watson was a Highway Policy Planner. Watson received the following rates of pay:

 November 2, 1971 $792.00 per month
 December 1, 1971 $809.00 per month (cost of living
 increase)
 May 16, 1972 $850.00 per month (merit increase)
 December 1, 1972 $893.00 per month (merit increase)
 December 1, 1973 $978.00 per month (cost of living
 increase)
 March 16, 1974 $1188.00 per month (merit increase)
 June 1, 1974 $1241.00 per month (cost of living
 increase)
 November 1, 1974 $1303.00 per month (merit increase)
 December 1, 1974 $1379.00 per month (cost of living
 increase)
 June 1, 1975 $1438.00 per month (cost of living
 increase)

*339
 December 1, 1975 $1499.00 per month (cost of living
 increase)
 January 1, 1976 $1565.00 per month (merit increase)
 March 1, 1977 $1654.00 per month (performance
 adjustment)

When first hired, Watson worked on a study on freight terminal facilities in St. Louis. He identified the locations of facilities, talked to various people, and obtained census information. Watson next worked on a peak hour traffic study. The responsibility was shared with another planner. Watson did prepare the report. He supervised a research assistant in connection with this project. Watson then worked on portions of an update of a long range transportation plan. In March, 1974, Watson was put in charge of the transportation planning unit.
12) Timothy Barry was employed by defendant from September 13, 1971 to the present. Barry received his Bachelor of Arts degree from Cardinal Glennon College, majoring in philosophy, education and social science, in 1961. Barry studied at Kenrick Seminary from 1961 to 1965 in the area of speech, theology, psychology and education; no degree was obtained from Kenrick Seminary. Prior to his employment with defendant, Barry was a high school teacher, a director of a parish school committee, and an associate director of the Commission on Human Rights, Archdiocese of St. Louis. During his employment with defendant, Barry was a Planner I from September 13, 1971 to January 16, 1972. From January 16, 1972 to March 1, 1975 he was a Planner II. From March 1, 1975 to September 1, 1976 Barry was a Planner III. On September 1, 1976 Barry became director of Metropolitan Development at defendant. Barry received the following rates of pay:

 September 13, 1971 $833.00 per month
 December 1, 1971 $850.00 per month (cost of living
 increase)
 January 16, 1972 $937.00 per month (merit increase)
 December 1, 1973 $1078.00 per month (cost of living
 increase)
 June 1, 1974 $1126.00 per month (cost of living
 increase)
 August 1, 1974 $1184.00 per month (merit increase)
 December 1, 1974 $1253.00 per month (cost of living
 increase)
 March 1, 1975 $1313.00 per month (merit increase)
 June 1, 1975 $1369.00 per month (cost of living
 increase)
 December 1, 1975 $1438.00 per month (merit increase)
 December 1, 1975 $1499.00 per month (cost of living
 increase)
 April 1, 1976 $1576.00 per month (merit increase)
 March 1, 1977 $1654.00 per month (performance
 adjustment)
 April 1, 1977 $1736.00 per month (merit increase)

When first hired, Barry worked with Berg, identifying policies and procedures involved in housing problems. Barry did field work on this project. He then joined the Regional Forum, a citizen group of defendant, and was involved with the housing and transportation task force. Barry worked with plaintiff in housing from March, 1974 to September, 1974. From March to July, 1974, plaintiff wrote completion reports while Barry worked as the "outside" person, setting up a pilot program with local governments. Barry also made two public presentations during this time. When Barry's work was evaluated, it was noted that he needed improvement in writing.
13) Terry Stuchlik was employed by defendant from January 10, 1969 to the present. Stuchlik received his Bachelor of Arts, majoring in geography and history, from Southern Illinois University, Edwardsville, Illinois in 1965. He received his Master of Arts degree in geography from Southern Illinois University, Edwardsville, Illinois in 1969. Prior to his employment with defendant, Stuchlik held the position of Planner I with the Southwestern Illinois Metropolitan Area Planning Commission, Collinsville, Illinois from January, 1968 to January, 1969. During his employment with defendant, Stuchlik held the position of Planner I from January 10, 1969 to December 1, 1970. He was a Planner II from December 1, 1970 to September 1, 1976. From September 1, 1976 to the present, Stuchlik was Census G.B.F./D.I.M.E. Planner. He received the following rates of pay:

 January 10, 1969 $640.00 per month
 June 1, 1969 $645.00 per month (cost of living
 increase)

*340
August 1, 1969 $686.00 per month (merit increase)
December 1, 1970 $707.00 per month (cost of living
 increase)
May 1, 1970 $780.00 per month (merit increase)
June 1, 1970 $799.00 per month (cost of living
 increase)
December 1, 1970 $822.00 per month (cost of living
 increase)
June 1, 1971 $873.00 per month (cost of living
 increase)
December 1, 1971 $892.00 per month (cost of living
 increase)
June 1, 1972 $893.00 per month (cost of living
 increase)
December 1, 1972 $914.00 per month (cost of living
 increase)
June 1, 1973 $933.00 per month (cost of living
 increase)
December 1, 1973 $978.00 per month (cost of living
 increase)
December 1, 1974 $1081.00 per month (cost of living
 increase)
June 1, 1975 $1127.00 per month (cost of living
 increase)
December 1, 1975 $1174.00 per month (cost of living
 increase)
March 1, 1977 $1233.00 per month (performance
 adjustment)

On May 12, 1972 Stuchlik was offered a merit raise from $892.00 per month to $937.00 per month, but the raise was turned down by Stuchlik. Stuchlik's first assignment was to supervise the completion of the County aspect of a census project. He did not write a report on this and no public presentation was made. His second project involved water and sewer planning. Stuchlik had no training in this area. After becoming acquainted with the subject area in general, he worked on reports and A-95 reviews. Stuchlik prepared reports on existing facilities and projections of future needed facilities. Stuchlik also made a public presentation to defendant's advisory committee. Stuchlik supervised other employees on an as-needed basis. From June, 1971 to June, 1972 Stuchlik worked on a land use model for the Corps of Engineers. He developed information, including field work. The data was given to the Corps who developed the model itself. Stuchlik also worked on the City of Arnold, Missouri Master plan, basically writing the plan himself.
14) David Visintainer was employed by defendant from January 4, 1972 to June 7, 1974, and from September 9, 1974 to July 8, 1977. Visintainer received his Bachelor of Science Degree, majoring in civil engineering, from the University of Missouri, Rolla, Missouri, in December, 1971. During his employment with defendant, Visintainer was a Planner I from January 4, 1972 to January 1, 1973. From January 1, 1973 to June 7, 1974 and from September 9, 1974 to September 1, 1976, he was a Planner II. From September 1, 1976 to July 8, 1977 Visintainer was an environmental engineer. During his employment, he received the following rates of pay:

January 4, 1972 $809.00 per month
June 1, 1972 $810.00 per month (cost of living
 increase)
January 1, 1973 $960.00 per month (merit increase)
June 1, 1973 $980.00 per month (cost of living
 increase)
December 1, 1973 $1027.00 per month (cost of living
 increase)
September 9, 1974 $1184.00 per month (rehired)
December 1, 1974 $1253.00 per month (cost of living
 increase)
June 1, 1975 $1308.00 per month (cost of living
 increase)
October 1, 1975 $1369.00 per month (merit increase)
December 1, 1975 $1427.00 per month (cost of living
 increase)
March 1, 1977 $1499.00 per month (performance
 adjustment)

Visintainer's first responsibility was as project engineer for a solid waste management program. In connection with this project, he supervised employees on an as-needed basis. Presentations were made to various groups and Visintainer also worked with an outside consultant employed for this project. Visintainer also worked on special assignments involving his attendance at meetings as Mr. Berg's representative. He also did A-95 reviews. He was in charge of developing a regional water plan, including the supervision of a few other employees. After his return to defendant's employ, Visintainer conducted a bridge inventory and assessment for three counties. This job required an individual with a structural background. Visintainer authored reports on potential landfill disposal sites, water and sewer facilities, bridge inventory and an interim recommendation for a water quality management plan.
*341 15) From the evidence adduced, the Court finds that plaintiff and Weidemann performed substantially equal work, involving similar tasks, requiring equal skill, effort and responsibility. Due to the differences in educational background, technical knowledge required for the specific responsibilities assigned, and the nature of the jobs performed, the Court concludes that plaintiff did not perform substantially equal work as that performed by Watson, Barry, Stuchlik and Visintainer.
16) When hired in September, 1969 Weidemann received a salary of $565.00 per month. There were three cost of living increases, each of approximately 3%, before plaintiff was hired. That would serve to increase Weidemann's starting salary to $617.50 per month; plaintiff received a starting salary of $613.00 per month. The Court finds that this wage differential was the result of sex discrimination. Based thereon, the Court concludes that, as a result of defendant's discrimination, plaintiff was damaged in the amount of $1,725.00.
17) Counsel for plaintiff expended 173.7 hours on the preparation of this cause. Counsel's customary charge is $35.00. The Court finds that a reasonable award of attorney's fees is $3500.00.

CONCLUSIONS OF LAW
This Court has jurisdiction of the subject matter and the parties to this suit in accordance with 42 U.S.C. § 2000e et seq.
It has been frequently held that "[t]he provisions of Title VII of the Civil Rights Act of 1964 regarding discrimination in compensation based on sex are construed in pari materia with the Equal Pay Act of 1963, Section 206(d), Title 29, United States Code". DiSalvo v. Chamber of Commerce of Greater Kansas City, 416 F.Supp. 844, 852 (W.D.Mo.1976). Accord, Orr v. Frank R. MacNeill & Son, Inc., 511 F.2d 166 (5th Cir. 1975); Ammons v. Zia Company, 448 F.2d 117 (10th Cir. 1971). Accordingly, plaintiff must establish that "a wage differential was based upon sex and that there was the performance of equal work for unequal compensation". Orr, supra at 171.
The evidence adduced at trial established that there was a wage differential. This Court found that the differential was based upon sex. Further, the Court has found that plaintiff and defendant's employee, Weidemann, performed equal work. There is no requirement that the job performed by plaintiff be identical to the job performed by Weidemann. Instead, the requirement of equality of work is satisfied
. . . when it is necessary to expend the same degree of skill, effort and responsibility in order to perform the substantially equal duties which they do, in fact, routinely perform . . . Katz v. School District of Clayton, Missouri, 557 F.2d 153, 156 (8th Cir. 1977).
Defendant has contended herein that the jobs performed by plaintiff and its various employees were not equal. The Court has found otherwise with reference to plaintiff and Weidemann. Additionally, defendant has emphasized throughout that the pay differentials were justified because plaintiff was unable to make an effective public presentation. Although the Court notes that this alleged inability was not noted on plaintiff's evaluation, public presentations did not appear to be a substantial part of the job required by many of defendant's employees. Thus, plaintiff's asserted inability to make effective presentations is irrelevant herein. Peltier v. City of Fargo, 533 F.2d 374 (8th Cir. 1976).
Plaintiff's claim of constructive discharge is without merit. It is the Court's conclusion, based upon the evidence adduced, that plaintiff voluntarily resigned and that the defendant did not "deliberately make . . [plaintiff's] working conditions so intolerable that . . . [plaintiff was] forced into an involuntary resignation". Young v. Southwestern Savings and Loan Association, 509 F.2d 140, 144 (5th Cir. 1975).