512 F.Supp. 729 (1981)
Lottie WRIGHT, a/k/a Lottie Williams, Plaintiff,
v.
MISSOURI DEPARTMENT OF CONSUMER AFFAIRS et al., Defendants.
No. 77-1168C(3).
United States District Court, E. D. Missouri, E. D.
March 31, 1981.
*730 Doris G. Black, St. Louis, Mo., for plaintiff.
Michael L. Boicourt, Asst. Atty. Gen., Jefferson City, Mo., for defendants.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court for a decision on the merits following trial to the Court of plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; 42 U.S.C. § 1981; and the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. Plaintiff claims that the defendants discriminated against her in various ways, including her discharge, her treatment on her job, and her allegedly disparate pay, because of her race and her sex. After consideration of the testimony and exhibits introduced at trial, the parties' briefs and the applicable law, the Court hereby makes the following findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52.

FINDINGS OF FACT
Plaintiff, Lottie Wright, is a black female citizen of the United States and a resident of St. Louis County, Missouri.
Defendant Missouri Department of Consumer Affairs, Regulation, and Licensing ("CARL") is a state administrative agency incorporated under the laws of the State of Missouri, with its main office in Jefferson City, Missouri. CARL was created in 1974 by the Omnibus State Reorganization Act of 1974, 3A V.A.M.S., Appendix B, § 4, and is one of numerous such administrative departments. Approximately eighteen existing State commissions, boards, and divisions were consolidated into defendant CARL by the reorganization.
Defendant Missouri State Council on the Arts ("MCA") is one of the state agencies which was transferred into CARL in 1974. 3A V.A.M.S., Appendix B, § 4.19 (Supp. 1981). Defendant MCA, a fifteen member commission, was originally created in 1965 for the purpose, inter alia, of stimulating and encouraging the study and presentation of the performing and fine arts in Missouri. 11A V.A.M.S. § 185.010 et seq. (Supp.1981).
Defendant Bill H. Welch is the Director of Financial Administration and Operations of defendant CARL.
Before commencing employment with defendant MCA in November, 1973, plaintiff did not have a college education; she had six hours of accounting beyond the high school level, and had taken a bookkeeping course in high school. Plaintiff's employment prior to her employment with MCA included one year as a claims examiner for an insurance company, four years as the office manager for a trucking company, and a total of approximately 12 months of seasonal work as an assistant accountant for the Mayor's Council on Youth in St. Louis. Plaintiff had also worked as a sewing machine operator and as an alterations supervisor in a department store. Plaintiff obtained a college education and a bachelor's degree after leaving the employ of defendant MCA.
Plaintiff was hired to begin work as Administrative Secretary of MCA on November 1, 1973, by Joseph Fischer, then Acting Director of MCA. Plaintiff was the only applicant for the job. At the time plaintiff was hired, there were four other employees at MCA: Mr. Fischer; a temporary assistant director, Barbara Vogel; and two secretaries. Mr. Fischer had worked at MCA since 1969, first as a secretary for a short time, then as Assistant Director, and, from October 1, 1973 to March, 1974, as Acting Director. He had kept the books at MCA for approximately his first seven or eight months of employment there. Mr. Fischer had fired plaintiff's predecessor, Virginia Keaton, a white female, in October, 1973, because her work had become erratic and she had not made entries in the books since July 1, 1973 (the beginning of the 1974 fiscal year).
As Administrative Secretary, plaintiff was responsible for a number of diverse *731 bookkeeping and office management duties. She was required to maintain personnel records; to keep records of federal and state grants and expenditures under those grants; to process applications for payments under the grants; and to buy supplies for the MCA office. Plaintiff was responsible for the timeliness, accuracy and completeness of the various forms, relating to payroll, payments from grants, and orders and payments for supplies, that were sent to the CARL office in Jefferson City, although plaintiff herself did not type the information on the forms. She was not, however, a supervisor.
Mr. Fischer trained the plaintiff into her job. He explained to plaintiff that the first priority was to get the books updated and to key them into new code numbers for the new fiscal year. As of late February, 1974, however, when Mr. Fischer first examined the books, plaintiff still had not updated the books and had no good reason for not having done so. In addition, the financial reports, showing monies allocated and spent, which plaintiff prepared for two MCA meetings while Mr. Fischer was Acting Director, did not balance, as they should have. While Mr. Fischer was Acting Director, forms were regularly returned from Jefferson City with errors.
Although Mr. Fischer found the plaintiff to be very cooperative and pleasant to work with, when Emily Rice was hired as the new Director of MCA, in March 1974, Mr. Fischer told Ms. Rice of the bookkeeping problem he had with plaintiff and recommended that plaintiff be fired or put on a long probation. Ms. Rice, who had met the plaintiff previously when they both worked for the Mayor's Council on Youth, replied that nothing required the MCA to have books. Mr. Fischer returned to his position as Assistant Director under Ms. Rice.
Plaintiff was given the working job title of Budget Officer on March 24, 1976 by Emily Rice. When Ms. Rice joined MCA, there were only three other employees, including plaintiff. Thus four people were staffing an office that had been staffed by five when plaintiff began work at MCA. However, the change in plaintiff's title itself did not entail a change in plaintiff's duties.
Emily Rice had no accounting background and knew nothing about State accounting systems although she was familiar with federal grant keeping methods. She relied on the accuracy of the forms submitted by plaintiff. She never attempted to check the MCA books personally. In her view, plaintiff performed satisfactorily. However, she was very aware that CARL perceived the MCA performance of fiscal operations to be unsatisfactory, and she herself believed that MCA could use the services of an accountant. Ms. Rice remained the Director of MCA until May, 1976, the effective date of her resignation, which was tendered in November, 1975.
In September, 1974, Bill H. Welch was hired as the Director of Financial Administration for the recently created CARL. He was responsible for all financial activities in the Department. Soon after arriving at CARL, Mr. Welch became concerned with what seemed to be the inordinate amount of time which his staff was required to expend on MCA. For example, Mary Kay Twehous, who was one of the accounting clerks at CARL, was responsible for verifying the information on warrant requests (request for payment) sent in by CARL divisions. After verifying the warrant information, she would send the warrant request to the Office of Administration. (The warrant request would have been made out by the division upon receipt of an invoice from a vendor.) If the warrant was approved by the Office of Administration for payment by the State Treasurer, a check would be issued by the Treasurer's Office to the central office of CARL and then relayed to the division for payment of the vendor.
In numerous instances in late 1974, Ms. Twehous received warrant requests from MCA that were either totally incorrect in important particulars, such as encumbrance numbers or account numbers, or were totally lacking such information. She also received one warrant request from MCA in *732 December, 1974 approximately three and one-half months after MCA had received the invoice.
On January 28, 1975, Mr. Welch wrote Emily Rice a letter informing her that immediate corrective action had to be taken in two areas, employee training and supervision, and fiscal organization and systems, to remedy "the unsatisfactory performance of fiscal operations" of MCA. Ms. Rice showed plaintiff this letter and they reviewed MCA procedures together to see where errors were being made. In early April, Welch and two other CARL personnel visited the MCA office and had a long review of MCA procedures and bookkeeping. Mr. Welch wrote in a subsequent letter to Emily Rice that he had noted several improvements in the filing and voucher processing system and noted that a flow chart of invoice processing had been prepared. He also noted that plaintiff had attended a five-day Civil Service Commission seminar on governmental accounting and bookkeeping. However, he also noted a lack of understanding by MCA personnel of individual responsibilities. In May, 1975, Welch wrote to the Director of CARL, Al Sikes, that MCA's financial records were incomplete and that although the MCA staff was displaying an improved attitude, the staff was in need of a "fiscally oriented person."
The errors noted by Mary Kay Twehous in documents coming from MCA continued throughout 1975 and 1976. In addition, in 1975 and 1976, plaintiff was consistently late in submitting payroll change information to Ms. Twehous, causing delays in processing the entire CARL payroll. Ms. Twehous had frequent discussions with plaintiff in 1974, 1975, and 1976 about these problems. Mary Ann Ruth, another CARL accounting clerk, also had numerous problems with documents submitted by the MCA while plaintiff was there, much more so than from other CARL divisions. Starting in 1975, Ms. Ruth kept a ledger for MCA accounts, at Mr. Welch's direction, as a back-up control, although she did not do so for any other CARL division.
In February or March of 1975, CARL contracted with the United States Civil Service Commission for a study of all CARL jobs (except those in the Public Service Commission and the Bicentennial Commission) with a view to classifying and ranking the jobs and equalizing the pay for like positions in all the various divisions of CARL. Robert Daugherty, then Director of Program Development for CARL, was in charge of this task for CARL. Questionnaires were sent to all CARL employees asking for a description of their duties; input was also obtained from the various division heads. Employees of the Civil Service Commission, and Cindy Shanker, a personnel officer in CARL whose supervisor was Mr. Daugherty, then prepared draft job descriptions and classifications. These draft job descriptions were sent to supervisors, who could recommend changes.
In at least one of the draft reports, plaintiff was classified as an "Accountant." However, in the final Civil Service Commission report on MCA positions, plaintiff's job was classified as "Account Clerk III." This, in essence, was a bookkeeper's title, according to Thomas Donohue, the Civil Service Commission employee in charge of the classification. It differed from the "Accountant II" position in MCA, for which a description was drawn up but which was vacant at the time, in that the "Account Clerk III" in essence only followed directions and could not make changes or adjustments in systems. A comparison of plaintiff's completed questionnaire, outlining her duties at MCA, and the job descriptions for "Account Clerk III" and "Accountant II" shows that plaintiff's job definitely fit the description of the former position more closely than it fit the description of the latter position. In any case, plaintiff was not the only employee whose classification was altered between the draft stage and the final report. The final Civil Service Commission report was accepted by CARL in October, 1975.
Effective March 15, 1976, Mr. Welch hired Corrine Freant, a white female, as a temporary CETA accountant for MCA. The job was funded by CETA only through the end of June. (Ms. Freant was then paid *733 by CARL until she resigned in September, 1976.) Ms. Freant was not hired to supervise or replace any MCA staff, but basically was hired to review MCA records since 1969, the last federal audit cutoff date, in preparation for an upcoming federal audit of MCA. Ms. Freant had obtained an associate degree (72 credit hours, including 30 hours in accounting) in accounting from St. Louis University in 1966, and had had extensive experience as a comptroller, office manager, and auditor with various firms.
Ms. Freant was to write weekly progress reports of her work to CARL. On April 9, 1976, she wrote to LaVerne Hughes, Chief Accountant and Budget Officer at CARL, that she was trying to find information on a $4,000 discrepancy and when she had asked plaintiff about it, plaintiff had responded she was also out $4,000 and that plaintiff wanted to be informed of Ms. Freant's final finding on the matter.[*] Ms. Freant's April 29, 1976 report to Mr. Hughes stated that MCA had no formal set of books, and that the files were a conglomeration of various years and programs. The letter also stated that warrant requests were not being issued in continuous numerical order and that acceptable systems of accounting were being ignored. It also noted that Ms. Freant found it hard to work with plaintiff and that plaintiff was out of the office frequently. Subsequent reports and "exception lists" on grants were of the same tenor. In Ms. Freant's opinion, plaintiff did not understand general accounting principles.
On May 5, 1976, plaintiff wrote to Kay Twehous concerning overtime pay totalling $83.52 for two MCA secretaries, Susan Paradee and Jennifer Edmonds. Plaintiff asked that checks be issued to them out of available state funds. However, later in May, plaintiff and Mr. Welch had a conversation in which Mr. Welch indicated that the secretaries' overtime would come out of a federal grant. The checks were later issued out of a federal fund which, in plaintiff's view, could not be used for that purpose. Rick George, who had become Director of MCA on June 1, 1976, told plaintiff she should take the checks to Jefferson City to straighten the matter out.
On June 22, 1976, plaintiff went to Jefferson City. Plaintiff talked to Mr. Welch, who again told her that the overtime pay could come from a federal professional development grant on this one occasion, as he had been assured by federal officials, or, it could come from state funds allocated to an employee who was paid with both state and federal funds. However, after receiving such instructions, plaintiff went to Kay Twehous and told her that Mr. Welch had said that the two overtime checks should be cancelled, and an overpay check should be made out to Ms. Mary Bailey, another MCA employee, on federal funds, which Ms. Bailey should use to pay Ms. Paradee and Ms. Edmonds. Kay Twehous said she would need to have written approval from Mr. Welch before she could do that, and asked plaintiff to leave the two checks with her. Ultimately, the two checks were used to pay the secretaries' overtime salary, and Mr. Welch had written approval from the federal grant administrators for such payment. Plaintiff's instructions to Kay Twehous represented a misunderstanding of Mr. Welch's instructions, and would have caused an improper method of paying the secretaries.
On July 13, 1976, Mr. Welch wrote plaintiff a letter giving her a reprimand and informing her that she was on probation for 30 days. The reasons stated were that plaintiff's work consistently had not been sufficiently accurate and timely, as Mr. Welch had been apprised by Corrine Freant's reports and by Kay Twehous and Mary Ann Ruth; and, the fact that the recent incident concerning the overtime paychecks had created the impression that CARL followed questionable fiscal procedures. Plaintiff was informed that her job performance would be evaluated by Mr. Welch and the Acting Director of MCA, *734 John Amberg, in thirty days, especially with respect to five specified areas. (Mr. Amberg became the Acting Director of MCA as of July 10, 1976. He had previously been MCA's program coordinator in the visual arts.)
Plaintiff's probationary period was extended for 30 days because she was on vacation from approximately July 27 through August 13. Plaintiff was invited to attend the meeting, held September 15, 1976 at MCA offices, at which her performance was to be evaluated, but plaintiff declined to attend the meeting, although she was at the MCA office at the time it was held, because she wanted to be represented at the meeting by her attorney, who could not be present, and because of plaintiff's ill health. Mr. Welch concluded after the review that plaintiff had failed to accomplish the conditions of probation satisfactorily.
Accordingly, Welch decided that plaintiff should be terminated. His decision was based on her unsatisfactory performance of her conditions of probation; her failure to show any improvement over a number of years and her inconsistency in performance; her refusal to accept responsibility for inaccuracies and delays; and the complaints of vendors about delayed payments. Plaintiff's race and sex had no bearing on Welch's decision either to terminate the plaintiff or to put her on probation.
The final record of the evaluation meeting, made from Susan Paradee's notes, shows that Mr. Amberg was most reluctant to have the plaintiff terminated at that time. He preferred that such a decision be deferred until the new MCA Director, Donald Tapperson, should assume his position. Mr. Amberg felt that plaintiff's attitude and her relations with the other staff and with grantees had been very good. However, Mr. Amberg conceded at the meeting that there were numerous errors in plaintiff's work, and he was apparently more concerned by the timing of the decision than the merits of the decision. Plaintiff was verbally notified by Mr. Amberg of the decision to terminate her on September 15, and the next day Mr. Welch wrote her a letter of termination. She was immediately relieved of her accounting clerk responsibilities and was instructed to work as Mr. Amberg's "special assistant" until September 29, 1976. Al Sikes, the Director of CARL, approved of plaintiff's termination.
Although plaintiff contends that, under the CARL Employee Handbook and Personnel Policies booklet, only the division director, John Amberg, could make the decision to terminate plaintiff, the Missouri reorganization law which consolidated MCA into CARL clearly provides that the director of CARL had the right to do so. 3A V.A.M.S. App. B §§ 1.7(1)(b), 4.19. While Welch was not the Director of CARL, the Director, Al Sikes, did concur in the decision; and Mr. Amberg in effect also acquiesced in the decision although it is clear that he would not have made the decision of his own initiative.
Moreover, Mr. Welch had had much longer exposure to plaintiff's work product than any of the four MCA Directors and Acting Directors who had worked with plaintiff in three years, and his decision was based on the quality of her work. Plaintiff was apparently quite personable. However, she simply did not have the aptitude for the details of MCA bookkeeping and procedures, and, with an operating budget of $124,000.00 and "pass-through" funding of approximately $1,350,000.00 in 1976, MCA required someone in plaintiff's position who had an aptitude for such details.
Plaintiff was not the only CARL employee in whose discipline or termination Mr. Welch participated. Sarah Goedde, a white female who could not grasp proper procedures after several training sessions, was terminated in May, 1976. Carolyn Smallwood, a white female, was terminated from the Bi-Centennial Commission in May, 1976 because fiscal management of the Commission, for which she was responsible, was in total chaos.
Plaintiff's successor was M.A.K., a white female. She was trained for three days at CARL offices in Jefferson City and then by Corrine Freant. CARL noticed much improvement in fiscal operations of MCA under *735 M.A.K. The Missouri General Assembly first appropriated funds for an accountant position in MCA for fiscal year 1978, beginning July 1, 1977.
Plaintiff's starting salary on November 1, 1973, was $7,938.00 annually; as of January 1, 1975 it was increased to $8,494.00 annually; and as of July 1, 1975, it was increased to $8,700.00 annually. As of July 1, 1976, her salary was increased to $9,300.00 yearly.
Mary Ann Ruth began work in CARL's office in August, 1974, at an annual salary of $6,600.00. After the Civil Service Commission study was adopted, her monthly salary increased to something over $600.00 and her title was changed to Senior Account Clerk. As of the Spring of 1977, her annual salary was $8,529.00.
M.A.K., plaintiff's successor, began work at MCA as an "Account Clerk" on November 15, 1976, at an annual salary of $8,200.00. She resigned effective March 25, 1977.
Corrine Freant's salary was $10,000.00 annually initially. Sometime during the course of her employment her salary increased to $12,000.00.
M.D.B., a white female with an M.A. degree in English from Purdue University, began work for MCA on August 19, 1974, as a secretary at an annual salary of $5,600.00. As of January 1, 1975, her salary was $6,500.04 and she was a "Resources Planning Assistant." As of July 1, 1975, her salary increased to $6,890.04, and effective August 1, 1975, her salary increased to $10,000.00 and she became Dance and Film Program Coordinator. As of July 1, 1976, her yearly salary increased to $10,600.00 from $10,000.00 and it increased further in 1977 and thereafter. She became Acting Director of MCA in 1978 and then Director.
F.B., a white female, started work as a Fiscal Officer in the Community Development division of CARL and the Missouri Division of Commerce and Industrial Development starting July 1, 1974. As of July 1, 1974, her annual salary was $6,930.00; as of February 1, 1975, it increased to $8,400.00; and as of July 1, 1975, she was a Fiscal Officer/Office Manager at a salary of $8,904.00. On August 1, 1975, her salary increased to $9,000.00; and as of July 1, 1976, it was $9,695.00. Her position was classified as that of Accountant in the CSC study and her duties included developing the Division of Community Development's bookkeeping system and providing technical assistance to staff regarding accounting and procurement methods.
D.D., a white female, started work as an Account Clerk in CARL's Division of Insurance in March, 1975, at an annual salary of $8,400.00. On July 1, 1975, her annual salary increased to $8,904.00. On October 1, 1975, her classification changed from that of Account Clerk to Accountant, but her salary remained at $8,904.00 annually. On January 1, 1976, her salary increased to $9,300.00 annually and on July 1, 1976, it increased to $9,900.00 annually. As of August 1, 1976, it increased to $10,200.00. The Division of Insurance had an operating budget of approximately $1,000,000.00 in 1976, and D.D. was responsible for its fiscal activities on a day-to-day basis. Her duties included the preparation of monthly expenditure reports for all sections of the Division.
B.L., a white male, began work at MCA as "Accountant" on April 1, 1978. B.L. has a high school degree and has a certificate as a statistical auditor by The City University of New York. He had worked as an auditor, senior auditor, and then supervising auditor in the Missouri Revenue Department from 1970 to 1978.
E.C., a white female, began work as an Assistant to the Controller with the Missouri Housing Development Commission in September, 1973. Her position as "Accountant I" was not a CARL classification, but a Merit System Classification. There was no showing as to her duties.
LaVerne Hughes, a white male, has been the Chief Accountant and Budget Officer for CARL since July 1, 1975. He started at CARL as an accountant on January 21, 1974 and on October 1, 1974 he became Chief Accountant. Prior to working at CARL, Mr. Hughes had worked for eleven years *736 for the Division of Welfare of the State of Missouri, first as an accountant and then as Budget Officer. He had also worked briefly as an auditor in the Missouri Department of Revenue and had been an accountant and office manager at numerous corporations. As Chief Accountant and Budget Officer he is responsible for developing the annual CARL budget of some $24,000,000.00.
As of March 31, 1976, minorities comprised 2.7% of CARL's workforce. At the time plaintiff left the employ of MCA, there was one other black person, K.T., working at a comparable fiscal position in CARL.
Plaintiff filed a charge with the Equal Employment Opportunity Commission on March 18, 1976, alleging that she had been discriminated against with respect to the terms and conditions of employment, promotion, and denial of overtime, because of her race. On October 1, 1976, plaintiff filed an additional EEOC charge, adding a claim that she had been put on probation and terminated because of her race and because of the filing of the previous charge. On July 19, 1977, the EEOC issued its determination letter on plaintiff's charges, finding that the evidence did not support plaintiff's claims. On August 5, 1977, the Department of Justice issued its Notice of Right to Sue. This action was filed on November 2, 1977.

CONCLUSIONS OF LAW
The Court has jurisdiction over Counts I, II and III of this action pursuant to 42 U.S.C. § 2000e-5(f); 28 U.S.C. § 1343; and 29 U.S.C. § 216(b) respectively.
As to Count I, the Court concludes that the defendants are not liable because neither plaintiff's race nor plaintiff's sex has been shown to have been even "a contributing factor" in any employment decision affecting plaintiff. Coleman v. Missouri Pacific R.R. Co., 622 F.2d 408, 410 (8th Cir. 1980). The Court finds that plaintiff did not establish a prima facie case of discrimination in her discharge, because such a prima facie case would include a showing that plaintiff was "demonstrably capable of performing [her] employment duties," Osborne v. Cleland, 620 F.2d 195, 198 (8th Cir. 1980), which the Court has found she was not. It was essentially plaintiff's inability to master the details of MCA bookkeeping (an obviously complex task) that led to her discharge, and not plaintiff's race or sex.
Nor can the Court conclude that defendants are liable to plaintiff because she was classified as an "Account Clerk III" instead of an "Accountant" in the final CSC study, and paid accordingly. The evidence showed that plaintiff's duties were in fact described much more closely by the "Account Clerk III" position description than by the "Accountant" position description. Moreover, plaintiff's final classification as Account Clerk III can only be attributed to the fact that plaintiff was not qualified or competent to perform the functions of Accountant. F.B. and D.D., whose positions were classified as those of Accountant under the CSC study accepted by CARL, earned only slightly more than the plaintiff and did not perform the same duties as the plaintiff performed. M.A.R., a white employee who worked in the CARL office with fiscal personnel and documents from all CARL divisions, was classified as an account clerk and earned less than plaintiff earned. M.A.K., the white female who succeeded the plaintiff in plaintiff's job, started at a lower salary than plaintiff had been receiving when plaintiff was discharged. Corrine Freant, whose salary was substantially higher than plaintiff's, was doing work which the plaintiff simply was not qualified to do. The Court finds that comparison of plaintiff to B.L. is not relevant because B.L. began work 1½ years after plaintiff left MCA; moreover, B.L.'s accounting experience was definitely superior to that of the plaintiff. Similarly, LaVerne Hughes had responsibilities and experience which far exceeded those of the plaintiff. Comparison with E.C. is not possible because there was no showing as to her duties, and her classification was not established by the CSC study. M.D.B., who had an M.A. degree, earned substantially less than the plaintiff until she became Dance and Film Program Coordinator, and her duties in that *737 position were obviously dissimilar to those of the plaintiff.
"To show a prima facie case [of discrimination in pay] [plaintiff] must prove she performed substantially equal work as her [fellow employees] but was paid less for it." Heymann v. Tetra Plastics Corporation, 640 F.2d 115 at 120 (8th Cir., 1981) (quoting Strecker v. Grand Forks County Social Services Board, 640 F.2d 96 (8th Cir., 1980). The Court cannot conclude that the defendants paid plaintiff less money than white and/or male employees who performed substantially the same work as the plaintiff.
The fact that plaintiff was one of a very small percentage of minority employees at CARL is a factor of some weight but it is certainly not determinative. King v. Yellow Freight System, Inc., 523 F.2d 879 (8th Cir. 1975).
Finally, the Court finds that there was no evidence of plaintiff's alleged harassment by defendant Welch; the evidence shows only that Welch and other CARL employees brought errors in MCA documents to plaintiff's attention in order to instruct the plaintiff on the correct way to complete those documents.
As to Count II, the Court's conclusions are identical to those applicable to Count I insofar as Count I alleged racial discrimination in various forms. See Johnson v. Railway Express Agency, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).
As to Count III, the Court's conclusions are identical to those applicable to Count I insofar as Count I alleged that plaintiff was paid less than male employees of CARL. The provisions of 29 U.S.C. § 206(d) are to be construed in pari materia with the provisions of Title VII relating to discrimination in pay on the basis of sex. Cullari v. East-West Gateway Coordinating Council, 457 F.Supp. 335 (E.D.Mo.1978).
Accordingly, the Court will enter judgment in favor of defendants on all three counts of plaintiff's complaint.
The defendants' request for an award of attorneys' fees will be denied because the Court does not find that this action was frivolous, unreasonable, or groundless. Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978).
NOTES
[*] It was later determined that the City of Florissant had been paid twice for a St. Louis Symphony Orchestra performance.