No. 81-427

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

LEVI JAMES SNELL,

Petitioner and Appellant,

vs.

MONTANA-DAKOTA UTILITIES COMPANY
and THE HUMAN RIGHTS COMMISSION
OF THE STATE OF MONTANA,

Respondents and Respondents.

---

Appeal from: District Court of the First Judicial District,
In and for the County of Lewis and Clark
Honorable Peter Meloy, Judge presiding.

Counsel of Record:

For Petitioner:

James E. Terry, ~~Kansas City~~ St. Louis, Missouri

For Respondents:

Crowley, Haughey, Hanson, Toole & Dietrich, Billings,
Montana
Jack Ramirez, Billings, Montana
Frederick F. Sherwood, Helena, Montana

---

Submitted on briefs: January 22, 1982

Decided: April 22, 1982

Filed: APR 22 1982

Thomas J. Kearney
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Petitioner appeals from a judgment in the First Judicial District Court, Lewis and Clark County, affirming the decision of the Human Rights Commission (Commission) and dismissing petitioner's employment discrimination action against Montana-Dakota Utilities Company (MDU). We affirm the District Court.

Petitioner presents the following issues for review:

(1) Did the District Court apply the proper standards of review in affirming the findings of the hearing examiner and the Commission?

(2) Are the findings of the hearing examiner adopted by the Human Rights Division and affirmed by the District Court supported by substantial evidence or are they "clearly erroneous?"

Petitioner, a Native American, worked as a serviceman fitter and welder for MDU in Wolf Point and Poplar, Montana, from July of 1973 until late September of 1976, when he resigned. He subsequently filed an employment discrimination complaint with the Commission, under section 49-2-501, MCA, alleging that racial harassment had forced his resignation, and seeking compensation for lost wages.

Petitioner's complaint was heard on December 21, 1979, before a hearing examiner appointed by the Commission. Witnesses appeared for both petitioner and MDU.

Petitioner testified that his foreman, Howard Hveem, pressured and criticized him unjustly, took tools from the truck and blamed him, handled machines in ways that endangered him, ignorantly criticized his welding technique, and directed

veiled racial slurs at him by making derogatory comments about blacks, and references to Hveem's own youthful clashes with "Assiniboines." According to petitioner, his complaints to his superiors went unheeded until he quit his job rather than risk a violent confrontation. At that point, Hveem was replaced as foreman by Jack Sprague, who, upon petitioner's return to work, made efforts to assure petitioner's satisfaction with working conditions, and to socialize with him at work. Petitioner claimed that within a few weeks of Hveem's replacement, the rest of the crew "took up for" Hveem, and began to ostracize him. He said they would bunch together in the coffee room, exchanging derogatory jokes about Indians, and using such words as "fucking Indian" and "blanket ass." The jokes and comments were not obviously addressed to him, he said, but he was only a few yards away, the only Indian in the room. He said the coffee room door was slammed in his face. He claimed the harassment occurred several times a week until he resigned, although he reported it to his foreman, Sprague. Petitioner said he was particularly reluctant to confront his co-workers because he had twice served time for assault, and was determined not to risk a conflict that could result in his being imprisoned again. He claimed the strain was beginning to undermine his health at the time he resigned. Finally, petitioner claimed that when he applied for unemployment compensation, he indicated discrimination was the reason for his resignation. He presented no evidence to corroborate that claim.

Petitioner's co-workers and supervisors -- those appearing for petitioner as well as those appearing for MDU -- testified without exception that they had not observed, participated in or heard of any racially-motivated harassment of petitioner;

-3-

he had not complained to them of racial slurs by fellow workers or discriminatory practices by the company. Their testimony presents an uncontradicted description of petitioner as a quiet loner, a good welder and valuable employee, toward whom his co-workers and supervisors felt no racial animus. Witnesses agreed that some MDU machinery moved quickly and could be suddenly and unexpectedly dangerous. But no one had witnessed any near miss they believed to be directed at petitioner by Hveem, nor had petitioner filed any "near miss report." Several men testified that petitioner had made them aware of his unwillingness to work with Hveem because Hveem's loud criticism made him nervous; not one said petitioner had mentioned that Hveem showed bias against Indians. Hveem himself agreed that he disapproved of petitioner because of petitioner's reluctance to do "the pick and shovel work," preferring welding. MDU supervisors testified that, subsequent to petitioner's complaining about Hveem, the foreman was replaced, not because of any racist behavior on Hveem's part, but because of his health and his difficulty handling his supervisory position. The supervisors also indicated that MDU has an active affirmative action program and instructs its management personnel that racial discrimination is not to be condoned.

There was general agreement among MDU employees that rough language and joking are common among MDU crews, and that many jokes are told, some about such ethnic groups as North Dakotans, blacks, Norwegians, Poles, and Indians. But they all agreed, including an Indian crew member, and others whose ethnic groups had been the butt of jokes, that there was neither malice nor viciousness in the jokes, and that

-4-

the jokes were not directed at petitioner. They testified, also, that the coffee room was airconditioned, although the rest of the warehouse was not, and during hot weather someone was always getting up and slamming the door shut. No one recalled the door being deliberately slammed in petitioner's face, as he claimed.

Several of petitioner's supervisors testified that he or his wife had indicated dissatisfaction with his salary precipitated his resignation, and that petitioner had never told them he resigned because of racial harassment.

The hearing examiner, on June 25, 1980, entered extensive findings of fact and conclusions of law, here included in relevant part:

"PROPOSED FINDINGS OF FACT

". . .

"26. That the testimony of the foreman and other witnesses corroborated much of the testimony of the Charging Party relating to the incidents of the tools; the fight with an Indian in 1936; reprimand for throwing away the welding rods; the near accidents; and the yelling by the foreman; and the preponderance of evidence clearly shows that these incidents did in fact occur.

". . .

"32. That pursuant to the complaints about the foreman yelling at the Charging Party; the health reasons of the foreman and the inability of the foreman to organize his work and employees, the Division Manager on December 1, 1975, demoted the foreman to gas service man, assigned a new foreman, Jack Sprague, to supervise the gas construction crew and the Charging Party and the Charging Party returned to work.

". . .

"37. That the preponderance of the evidence clearly reflects that jokes were told by co-employees some of which related to Indian people and that there was swearing by the co-employees and that some of such swearing was used in reference to Indian people but that none of the jokes or swearing were directed to the Charging Party."

"...

"47. That the Charging Party testified that
a few weeks prior to termination he notified
the Division Manager as to his complaints in
that he did not want to work around 'Indian
haters.'  However, the Hearing Examiner does
not find that testimony credible. . . and
finds the testimony of the Division Manager
and engineer more credible in that the con-
versations with the Division Manager and
engineer only related to wages.

"48.  That the Charging Party left employment
due to insufficient wages."

The hearing examiner concluded that foreman Hveem's actions
"did not reflect racial animus;" that the jokes and profanity
among co-workers "did not show racial harassment directed to
the Charging Party but was conversation normally associated
with construction workers;" that petitioner did not bring
the alleged racial slurs and discriminatory treatment to
the attention of MDU management; and finally, that charging
party's resignation was due to a salary dispute, not racial
harassment.

Petitioner filed exceptions to the hearing examiner's
proposed findings of fact and conclusions of law.

On November 21, 1980, the Commission heard the exceptions,
adopted the hearing examiner's findings and conclusions, and
dismissed petitioner's complaint.  Petitioner requested
judicial review in the First Judicial District Court, pursuant
to §2-4-702, MCA, and oral argument was heard on March 24,
1981.  Additional briefs were filed.  On June 30, 1981, the
District Court affirmed the decision of the Commission and
dismissed petitioner's complaint.

The District Court opinion emphasized that "[a]lthough
petitioner is seeking judicial review on grounds (a) through
(f) of §2-4-704 MCA no contention is made except as to
subdivision (e), i.e., that the decision of the administrative

-6-

agency is 'clearly erroneous in view of the reliable, probative and substantial evidence on the whole record' . . ." The District Court, relying upon section 2-4-704(2), MCA, ("the court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact,") and upon similar language in Martinez v. Yellowstone County Welfare Department (1981), ____ Mont. ____, 626 P.2d 242, 38 St.Rep. 474, concluded that the commissioner's decision was amply supported by evidence and testimony. Petitioner appeals.

We note Martinez' reference to federal case law arising under Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C. §2000e et. seq. The Montana Human Rights Act, Title 49, MCA, is closely modeled after Title VII, and reference to pertinent federal case law is both useful and appropriate. See Martinez v. Yellowstone County Welfare Department, ____ Mont. at ____, 626 P.2d at 245, 38 St.Rep. at 477.

I.

Petitioner argues that the District Court applied the wrong standard of review, i.e., that it erred by limiting its consideration to the sufficiency of the evidence when petitioner had also claimed error of law justifying modification or reversal under section 2-4-704(2)(d), MCA. Petitioner contends that it was error of law for the Commission to find (1) "that the ethnic jokes and racial epithets petitioner was subjected to were not racial harassment," and (2) "that MDU cannot be held liable where petitioner did not bring this conduct to the attention of his supervisors." We do not agree.

The hearing examiner determined as a matter of fact that (1) ethnic jokes and curses occurred, but they were not

directed at petitioner, and (2) several employees testified that "no one gave it much thought." The hearing examiner concluded that this "did not show racial harassment directed to the Charging Party but was conversation normally associated with construction jobs." It is obvious the hearing examiner determined that the objectionable remarks were merely casual conversation. Title VII cases indicate that the sensitivity of an employee to casual remarks, isolated incidents of harassment or an occasional racial slur is not sufficient to support a Title VII complaint:

> ". . . [A]lthough a pattern of practice of harassment directed at a single employee can violate Title VII, casual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action. Cariddi v. Kansas City Chiefs Football Club Inc., 568 F.2d 87, 88 (8th Cir. 1977); Fekete v. U. S. Steel Corp., 353 F.Supp. 1177, 1186 (W.D. Pa. 1973); see Int'l Brhd of Teamsters v. United States, 431 U.S. 324, 336 n. 16, 97 S.Ct. 1843, 1854 n. 16, 52 L.Ed. 2d 396 (1977)." Bundy v. Jackson (D.C.Cir. 1981), 641 F.2d 934, 943 n.9 (sexual harassment).

> "After a painstaking review of the transcript, we conclude that as a matter of law the racial slurs, if any, used at Bunny Bread did not violate Title VII. We find no steady barrage of opprobrious racial comment. The use, if any, of racial terms was infrequent, was limited to casual conversation among employees, and with possible rare exceptions was not directed toward appellants." Johnson v. Bunny Bread Company (8th Cir. 1981), 646 F.2d 1250, 1257 (failure of proof of constructive discharge).

> "Some of his complaints concerning racial slurs are probably true. On the other hand, it is probably also true that there is nothing which the management or leadership of a company like Cameron can do which will totally and absolutely prevent persons from all races from uttering racial slurs. Some stoic and patient acceptance of these slurs is merely one of the prices that all of us pay for living in a pluralistic society." Buckner v. Cameron Iron Works (S.D. Tex. 1979), 23 FEP cases 1092, 1102.

The hearing examiner also found as a matter of fact that petitioner made a number of complaints, but they concerned wages, paperwork, and dissatisfaction with his foreman, Hveem. He concluded that petitioner did not bring alleged incidents of racial harassment to the attention of MDU management. He explicitly did not find credible petitioner's claim that he did not want to work around "Indian haters," and had resigned because of discrimination, finding instead that petitioner's resignation was due to insufficient wages. Federal discrimination cases do not penalize an employer for its ignorance of employee misconduct.

> "A continuing course of harassment by fellow employees cannot be imputed to an employer unless the employer is aware of such harassment and fails to take reasonable steps to remedy the practice. De Grace v. Rumsfeld, 614 F.2d 796, (1st Cir. 1980)." Kidd v. American Air Filter Co. (W.D. Ky. 1980), 23 FEP cases 381, 382.

> ". . .[P]laintiff must show that the employer failed 'to take reasonable steps to prevent racial harassment. . .' At what point management must be deemed to be aware of racial harassment by employees and must take affirmative steps to remedy the situation is disputed. Some courts have refused to find Title VII violations unless supervisory personnel actually participated in the harassment. . . The Court believes, however, that the standard for a violation of Title VII should be stricter than that of actual participation by management and supervisory personnel. If management knows or should know of incidents of racial harassment that are more than sporadic, it has a responsibility to take reasonable affirmative steps to eliminate such incidents. . .(One may infer from intensity of harassment that management was aware or should have been aware); [citations omitted]." Equal Employment Opportunity Commission v. Murphy Motor Freight (D. Minn. 1980), 488 Fed.Supp. 381, 385-386.

In both the question of whether the jokes and swearing constituted racial harassment and whether MDU was responsible if the incidents were not brought to a superior's attention,

the hearing examiner's conclusions are consistent with federal case law, and logically flow from his findings of fact. Petitioner himself stated in his exceptions that what he considered errors of law in the hearing examiner's conclusions necessarily followed from erroneous findings of fact. The District Court correctly assessed petitioner's arguments as a challenge to the sufficiency of the evidence, and properly limited its review to that issue.

We also note that a finding of racial harassment would not automatically mandate a finding of constructive discharge:

> "There is no clear standard for constructive discharge in a Title VII case. In some situations where 'an employee involuntarily resigns in order to escape intolerable and illegal employment requirements,' a constructive discharge may be found. Young v. Southwestern Savings and Loan Association, 509 F.2d 140, 144 (5th Cir. 1975). Contrary to plaintiff's theory, however, the conclusion of constructive discharge does not automatically arise whenever employment discrimination is followed by the victim's resignation. See e.g., Muller v. U. S. Steel Corporation, 509 F.2d 923 (10th Cir. 1975), cert. denied, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); Cullari v. East-West Gateway Coordinating Council, 457 F.Supp. 335 (E.D.Mo. 1978). A determination of constructive discharge depends on the totality of circumstances, and must be supported by more than an employee's subjective judgment that working conditions are intolerable." Nolan v. Cleland (N.D. Cal. 1979), 482 F.Supp. 668, 672.

It is a matter of degree, a question of fact for the trial court, whether by encouraging, participating in or allowing a known pervasive pattern of discrimination, against an employee or a class of employees, the employer has rendered working conditions so oppressive that resignation is the only reasonable alternative. Petitioner has not challenged the federal cases; rather, he contests the factual determinations which led to their application.

Finally, petitioner argues that the hearing examiner

and the District Court failed to follow the procedure set forth in _Martinez_, _supra_, for determining whether he had established a _prima_ _facie_ case of discrimination. He maintains that MDU would have had to show a legitimate, nondiscriminatory reason for the apparent discrimination, once petitioner had shown that, as a member of a racial minority he suffered damages as a direct result of racially-based disparate treatment, of which his employer was, or should have been, aware. Petitioner states the standard accurately enough, but ignores the fact that, according to the hearing examiner, he did not make the requisite _prima_ _facie_ showing of discrimination.

The hearing examiner's findings indicate that petitioner did not show that MDU was or should have been aware of racial harassment directed at him; he did not establish that he was treated differently from his non-minority co-workers; he did not show the ethnic jokes were directed primarily at Indians or at him. He did not show that Hveem's actions and criticisms sprang from racial animus. These are factual determinations, to be discussed below.

## II.

Petitioner argues that the District Court's findings of fact and conclusions of law are inconsistent. The record shows that the District Court merely recapitulated the history of the case and the hearing examiner's findings and conclusions. Then, in a brief opinion the court set forth the standard for reviewing those findings and, finding ample evidence to support them, affirmed the Commission's order.

There is no need to review those facts in detail. Petitioner alone alleged that racial harassment was directed at him. He alone maintained that he had notified his superiors of the alleged harassment. And he alone testified that he

told his superiors he was resigning because of racial harassment. No other witness corroborated those allegations; no one recalled any harassment of petitioner, or any complaint by petitioner about harassment. And no one else felt that the jocular, frequently profane, ethnic references between employees were vindictive or directed at petitioner. Petitioner's superiors testified that the only dissatisfaction petitioner mentioned to them concerned wages, paperwork, and his discomfort with Hveem's criticism.

Section 2-4-704(2) provides:

> "(2) The court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact."

This Court amplified that provision in Martinez, supra:

> ". . . In questions of this kind, where the agency is entrusted and charged with administering the statute and making necessary, initial factual determinations, it is well settled that a reviewing court's function is limited. Where factual determinations are warranted by the record and have a reasonable basis in law, they are to be accepted. It is not the court's function to substitute its own inferences of fact for those of an administrative tribunal or agency, where facts are supported by the evidence in the record.
>
> ". . .
>
> "Where the issue (in controversy) is so close and there is sufficient credible evidence on the record which would allow reaching opposite conclusions, we think that a finding which overturns another as being 'clearly erroneous' is an abuse of discretion. Where the District Court's reviewing function is limited, as in this case, the findings of administrative agencies and tribunals must be sustained where there is sufficient credible evidence in the record." Martinez v. Yellowstone County Welfare Department, ____ Mont. at ____, 626 P.2d at 247-248, 38 St.Rep. at 480, citing Standard Chemical Manufacturing Company v. Employment Security Division (1980), ____ Mont. ____, 605 P.2d 610, 613-614, 37 St.Rep. 105, 108-110.

The District Court properly found "ample evidence and

testimony" to support the findings and conclusions of the hearing examiner and the Commission.

Petitioner also challenges the logic of several of the hearing examiner's determinations:

(1) Petitioner claims that for MDU to assign him to work under Hveem, who knew less about arc welding than did petitioner, is evidence of MDU's disparate treatment of him, and the hearing examiner could not reasonably find no discriminatory conduct on the part of MDU. We would point out that Hveem had spent 29 years with MDU, and was, apart from his lack of expertise in arc welding, a reasonable choice for foreman. Furthermore, when certain unjustified reprimands by Hveem of petitioner's arc welding technique were brought to the supervisor's attention, Hveem was directed to stop them. There is no evidence of disparate treatment of petitioner here.

(2) Petitioner argues that it is more reasonable to conclude that the conditions which led to his first resignation were not remedied by MDU and caused his final resignation, than that he left because of insufficient wages. But the weight of the evidence indicates that petitioner's dissatisfaction with Hveem led to his first resignation, and was remedied by Hveem's replacement by Sprague as petitioner's foreman. Also, when petitioner resigned in 1976, he told two of his supervisors he was doing so because of dissatisfaction over wages. There is no evidence but petitioner's own testimony, part of which the hearing examiner explicitly found not credible, to support his claim that discrimination and harassment forced his resignation. There is no inconsistency here.

(3) Petitioner argues that it was not logical for the hearing examiner to find that he resigned over a salary dispute, when the record shows that he refused MDU's offer of more money to do independent welding work for MDU. But the record also shows that the nature of the work offered would have been different. Further, neither the hearing examiner nor the District Court found that petitioner's belief that he had been racially harassed was spurious and unrelated to his resignation. Nor do we. It is entirely possible that petitioner's sensitivity to his co-employees' conduct played a part in his decision to resign and his decision not to accept MDU's offer of independent work. But petitioner has not shown this Court, as he did not show the hearing examiner and the District Court, that the conduct actually amounted to racial harassment, or that he had brought it to MDU's attention. We do not find petitioner's refusal to accept MDU's offer convincing evidence that petitioner was, in fact, a victim of racial harassment.

(4) Finally, petitioner exhorts this Court to "breathe life into the words 'equal opportunity'" by requiring a lower threshold for a finding of racial harassment than that established by the federal courts in Title VII cases. We would remind petitioner that this Court has a responsibility to the employer as well as to the employee. Part of that responsibility consists in requiring adequate credible evidence of discrimination before subjecting an employer to the penalties associated with a finding of discrimination. This is particularly important where, as here, there is only one person alleging harassment or discrimination. It would be irresponsible for this Court to reverse the District Court,

-14-

in the teeth of the hearing examiner's finding that, as to a crucial question of fact, petitioner's testimony was not credible, and despite the District Court's determination that the weight of evidence supported MDU's innocence of constructive discharge. That we decline to do.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices