No. 89-06

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

---

JOHN KENNETH FINSTAD,

       Plaintiff and Respondent,

-vs-

THE MONTANA POWER COMPANY,

       Defendant and Appellant,

---

APPEAL FROM:  District Court of the Ninth Judicial District,
In and for the County of Glacier,
The Honorable R. D. McPhillips, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Robert T. O'Leary and Patrick T. Fleming argued,
Montana Power Co., Butte, Montana

    For Respondent:

        John C. Hoyt; Alexander Blewett, III, argued; Hoyt &
Blewett, Great Falls, Montana

---

Submitted:  October 17, 1989

Decided:  January 9, 1990

Filed:

Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

Mr. Finstad sued Montana Power Company (MPC) in the Ninth Judicial District Court, Glacier County, alleging a violation of the implied covenant of good faith and fair dealing in his termination or constructive discharge. The District Court denied MPC's motions for a directed verdict which were made at the close of the plaintiff's case-in-chief and at the conclusion of all testimony. The jury awarded Mr. Finstad $433,500 in compensatory damages. MPC moved for a judgment notwithstanding the verdict and a new trial and the motions were denied. MPC appeals. We reverse.

The determinative issues are:

1. Was there substantial credible evidence to support a conclusion that Mr. Finstad was either actually or constructively discharged?

2. Does the implied covenant of good faith and fair dealing apply to termination following an employer's offer of a transfer of employment without change in compensation or other benefits where the employee refused the transfer?

Mr. Finstad was employed by MPC for 22½ years as a field engineer. For the last 15 of those years, he was stationed by MPC at Cut Bank, Montana. As a field engineer he was in charge of MPC's oil and gas exploration and production, principally in northcentral Montana and southern Alberta, Canada. Both parties agree that Mr. Finstad was a capable, loyal and devoted employee. Mr. Finstad remained employed in that capacity until June 2, 1982. On that date, despite the urgings of his supervisor in MPC, he refused to accept a transfer from Cut Bank to Butte and his employment ended. Mr. Finstad contends that he was fired. MPC contends that he refused the transfer and chose to leave MPC. Because the facts are critical to this decision, we will later detail the

2

facts which have led us to the conclusion that Mr. Finstad was neither actually discharged nor constructively discharged and that he refused to accept a transfer from Cut Bank to Butte without a change in job responsibilities, earnings or benefits. That transfer is herein described as a lateral transfer.

On May 29, 1985, Mr. Finstad filed his complaint against MPC. He alleged that he had been employed for 22½ years, with the last 15 in Cut Bank; that his principal responsibilities were all phases of drilling and production problems; that he gave his full loyalty, devotion and energies for the benefit of MPC; and that he was receiving a substantial salary as a petroleum engineer. In addition he alleged that on June 2, 1982 he was informed by officials of MPC that they were eliminating his job assignment and position at Cut Bank "for the stated reason that the Montana Power Company was eliminating future drilling in southeast Alberta and except for workovers and shallow holes, was shifting away from northern Montana to various other areas: all of which is and was false." (Emphasis supplied.) In addition he alleged that MPC informed him that if he did not voluntarily move to Butte he would be discharged and that the reasons for discharge were false. He also alleged that the policy of MPC was to provide severance pay which had been intentionally withheld; and that MPC had violated the implied covenant of good faith and fair dealing in regard to the "termination or constructive discharge of plaintiff." The last basic allegation was that the representations made by MPC to Mr. Finstad were knowingly false and designed to eliminate plaintiff from the payroll of the defendant even though he was a long time, loyal and faithful employee.

There was no pretrial order. The jury was thoroughly instructed on the application of the covenant of good faith

3

and fair dealing. However, the special verdict form failed to present the jury with more than one conclusory question on its application. After a 5 day trial commencing May 23, 1988, the jury returned a special verdict in favor of Mr. Finstad. Following is the entire verdict:

> [W]E THE JURY, in the above entitled case, answer the questions submitted to us in this special verdict as follows:
>
> Question No. 1, Do you find that Defendant, Montana Power Company breached the covenant of good faith and fair dealing owed to Plaintiff and that such breach was a cause of damages to Plaintiff?
>
> Answer: Yes  X  No ___
>
> Question No. 2: What is the amount of compensatory damages sustained by Plaintiff?
>
> Answer: $433,500.00.
>
> Question No. 3: Do you find that punitive damages should be assessed against Defendant?
>
> Answer: Yes ___ No. X

Following the denial of MPC's motion for entry of judgment notwithstanding the verdict and motion for new trial, MPC appealed.

I

Was there substantial credible evidence to support a conclusion that Mr. Finstad was either actually or constructively discharged?

Because of the nature of our holding, we will make a detailed review of essential factual proof. Because this is an appeal from a jury verdict, this Court must view the evidence in the light most favorable to the prevailing party, and determine whether substantial credible evidence in the record supports the jury verdict. Bottrell v. American Bank

4

(Mont. 1989), 773 P.2d 694, 46 St.Rep. 561. In the absence of probative facts to support the jury's verdict, it may be overturned. Jacobsen v. State of Montana (Mont. 1988), 769 P.2d 694, 697, 46 St.Rep. 207, 211.

MPC maintains that it did not terminate Mr. Finstad. It contends that the record fails to show either an express termination or a constructive discharge. It also contends that the covenant of good faith and fair dealing should not be applied to a refusal to accept a lateral transfer. The contentions appear more fully in our factual review.

Mr. Finstad maintains that he was fired. Again we will not summarize his contentions further as they appear at length in the testimonial review.

Initially on direct examination, Mr. Finstad testified as to his normal long work days and work years, showing that he worked over 340 days in the calendar year 1980, and emphasizing his lack of vacation and the manner in which he was continually on call. He also testified as to his development of an external casing packer and other exploration techniques which saved substantial monies for MPC. His testimony described his competence and abilities at some length. We note that MPC did not in any way attempt to contradict this evidence. In fact the evidence submitted by MPC established that the supervisors of Mr. Finstad also thought he was extremely capable and well qualified and did their best to encourage him to accept the transfer from Cut Bank to Butte.

Mr. Finstad testified that in May 1981, Mr. Percival called from Butte and offered him the drilling manager job in Butte. In response he said he was pleased with being offered the drilling manager's job, which was a big promotion. However Mr. Finstad told Mr. Percival that he was interested in staying in Cut Bank for one more year so that his youngest son could graduate from high school. That was acceptable to

5

Mr. Percival and nothing further was said about the drilling manager job.

Mr. Finstad next testified that he received a memorandum from D.K. Percival. He testified that this was the only written memorandum or document which suggested a move to Butte. Following is Exhibit 1, the entire memorandum:

April 17, 1982

MEMORANDUM

TO:  Ken Finstad

cc:  Carl Anderson
    Pete Madison
    John Van Gelder
    Bill Roberts
    Neil Van de Kop

RE:  Relocation of Companies' Drilling
    Supervisor

Effective July-1, 1982, supervision of all companies' drilling activity will be located in the Butte office. Carl Anderson has visited with you on the subject and has requested that you move to Butte to assume your duties from this office. As usual, I have not paid much attention to the title that goes with the job, but the job description and content initially will remain much the same as it is at the present time. Neil will remain in Cut Bank to handle whatever part of the workload that is appropriate from that location. We will work out details of office space, communications, etc. required to serve Neil in Cut Bank prior to July 1st.

You will report to the Chief Petroleum Engineer or Manager-Petroleum Engineering, who will in turn be reporting to Carl. We are now working to fill that position and hope to have that done by July 1, 1982.

The reason for the re-location is the distinct possibility that we will be pulling out of SE Alberta and that our future drilling, except for

6

post holes and production workovers, is likely to
be shifting away from northern Montana to various
other areas. As this happens, the unique reason
for maintaining your office in Cut Bank will have
ended.

I hope you will accept this transfer. I know
it will broaden your experience beyond the field
supervision level that you have done well for many
years. Should you decide not to make the move,
please let Carl know by June 1, 1982, so that he
can plan accordingly.

s/ Don
D. K. Percival

DKP:bw (Emphasis supplied.)

Mr. Finstad testified that on April 14, 1982, prior to
his receipt of Exhibit I, Carl Anderson, his immediate supe-
rior, visited with him in the MPC office in Cut Bank. Mr.
Finstad pointed out that the visit was very brief and that
Carl had called and stopped by and visited about a possible
Butte move. There was no discussion of the drilling manag-
er's job.

Next Mr. Finstad testified that on May 3, 1982 he was
flying to Red Lodge and Dillon and stopped and talked to Mr.
Percival, then president of Entech, a non-utility part of
MPC, and with Mr. Anderson. He testified he spent approxi-
mately one hour with them and that both of them told him that
his job title and work were going to be exactly the same as
in Cut Bank. He explained that this meant he would be driv-
ing from Butte instead of Cut Bank, and that he wouldn't be
able to accomplish anything since he would be constantly
traveling from Butte to northern Montana and southeastern
Alberta. He pointed out that Carl Anderson told him that he
was going to expand his horizons and probably be traveling to
Louisiana and Texas. At trial he pointed out that he had
expected to be offered the Drilling Manager job when he went

7

to Butte. He testified that if it had been offered to him, he would have taken it even if it meant moving to Butte. Mr. Finstad testified that at the end of that meeting, he made no response to their suggestion of the move to Butte.

Plaintiff's Exhibit 1 specified that Mr. Finstad was to let Mr. Anderson know by June 1, 1982, as to his decision on the transfer. Mr. Finstad testified that on June 2, 1982, Mr. Anderson met with him at Cut Bank. Mr. Finstad testified that he had received no elaboration about the pull out from southeast Alberta and northern Montana and that he had worked for MPC for 22 years and knew that was the area from which MPC was obtaining the gas. He told Mr. Anderson he didn't believe that MPC would pull out. Mr. Finstad then testified in more detail as to his thought that if he moved to Butte he would be on the road from Butte to wherever they were drilling and told Mr. Anderson he couldn't accomplish much while behind the wheel of a car.

Because of the conflicting arguments made by the parties, and in order that the testimony establishing various critical elements is set forth, we will detail substantial parts of the examination of Mr. Finstad. Because of the length of the quotations, we will underscore portions of the examination which appear particularly relevant. The direct examination of Mr. Finstad in relation to the matter of termination shows:

> Q Do you recall Mr. Fleming [counsel for MPC] telling this jury that you would not agree with the decision of the Montana Power Company and chose not to be employed by it anymore?
>
> A Yes.
>
> Q Tell this jury when you chose not to be employed by the Power Company?

8

A   I never did choose not to be with Montana Power.

Q   You heard Mr. Fleming state that no one came into the office and said, You're fired.

A   Yes.

Q   What did happen?

A   Carl came in that morning about 9:00 and sat down and told me that I would be moving to Butte. Once again, he told me that I would be doing the same things I had been doing in Cut Bank. I tried to point out to him that I just couldn't keep that pace up. I had recently gotten out of the hospital and I was devoting all of my time, as it was, to Montana Power. And, I just didn't think it was going to work and we talked for perhaps a half an hour and we neither were making any headway and Carl said, Well, I need to talk to Don Percival.

Q   Did you suggest that he do that?

A   No.

Q   Why did he tell you he needed to talk to Don Percival?

A   I don't really know.

Q   What were you trying to tell him would happen to the Power Company if they moved you to Butte?

A   I was just simply telling him it wouldn't be efficient. I didn't see how I could run that operation out of Butte and drive the miles they expected me to.

A   He came through the door and he said, Give me the keys to your Company car, and he says, Turn in your credit cards, and he said, You can clean out your personal effects from this office.

Q   What did you say?

9

A    I said, You mean there aren't any alternatives to this?

Q    And, what did he say?

A    And, he said, There are none.

Q    Did you say anything else?

A    I said, you know, Isn't there any compassion left in this Company?

Q    And, what did he say?

A    He said, Well, you know, when Percy puts the knife in, he likes to twist it.

Q    Then when Carl Anderson came into your office, demanded your credit cards, your key to the office and your car, and told you to clear out of the office, what did that mean to you?

A    Well, that was the end of my career.

Q    Did that mean you were fired?

A    Yes.

Q    Did you resign?

A    No.

On the matter of moving and choices, Mr. Finstad further testified on direct:

Q    The question was, what did you think would happen if you didn't move to Butte when Carl suggested that on June 2nd, 1982?

A    I had assumed that I would be given an opportunity to do something other than moving to Butte, some other job.

Q    Were you ever told by Carl or Don or anyone else that there was a problem between the Power Company and you?

10

A   No.

Q   If someone had told you, any of these people that told you, if you didn't move to Butte, you would have been fired, what would you have done?

A   I would have gone to Butte.

Mr. Finstad testified with regard to his letter to Mr. McElwain, Chairman of MPC.   Following is that Plaintiff's Exhibit 16:

June 21, 1982

Mr. J.A. McElwain
Chairman
The Montana Power Company
40 East Broadway
Butte, Montana, 59701

Dear Joe:

On June 2, 1982 in a meeting with Carl Anderson, my job as a Senior Petroleum Engineer was terminated after 22 years with Montana Power.  The termination was the result of turning down a transfer to the Butte office.

My reasons for turning down the transfer were multifaceted and explained in detail to Anderson. At the end of the meeting I asked Anderson if there were any options open to me.  He told me there were none, and if I chose not to accept the transfer to turn in my car keys and vacate the office at once. Anderson took my car back to Butte that day.

I sincerely hope that no other 20 year employee will have to suffer the loss of their job in this uncompromising manner.

For the loss of job and benefits I believe I am due severance compensation commensurate with my salary and years of employment.

Yours truly

(Emphasis supplied.)        s/ J.K. Finstad

On direct examination Mr. Finstad explained that he had used the word "termination" in the letter because the toughest

11

word for him to use was "fired." Following is the reply from Mr. McElwain to Mr. Finstad, Defendant's Exhibit 1:

June 28, 1982

Mr. Ken Finstad
111 - 9th Avenue, S.E.
Cut Bank, MT 59427

Dear Ken:

I am in receipt of your letter of June 21 and I am very disappointed that you have come to the conclusion that you did not want to continue working for Montana Power Company as it meant a transfer to the Butte office. We have valued your services very greatly and, as you know, Carl Anderson has on two occasions tried to prevail upon you to try to change your mind. I have reviewed the statements made by you concerning Carl Anderson's actions and find them not to be substantive to what actually occurred. <u>Your termination was totally your choice because of your refusal to accept an assignment outside of Cut Bank when there was no additional need for your services there.</u>

Your 22 years of service with Montana Power Company makes you eligible for vested retirement benefits from Montana Power. Because of that fact, the provisions of our severance compensation policy do not allow for consideration of severance termination pay.

My best wishes to you and your family. I deeply regret your decision not to continue with Montana Power Company in light of the circumstances.

Very truly yours,

s/ Joe McElwain

JAM/pg
bcc. D.K. Peracival
     Carl Anderson

12

In response to Mr. McElwain, Mr. Finstad further wrote an additional letter, Plaintiff's Exhibit 17:

July 6, 1982

Mr. J.A. McElwain
Chairman
The Montana Power Company
40 East Broadway
Butte, Montana, 59701

Dear Joe:

I feel I must continue this dialog because you say review of my statements were not substantive. I will elaborate these statements. I pointed out the Cut Bank office was in the mainstream of activity and it was this nuts & bolts hands on activity that led to the development of an air driving technique that added several billion cubic feet of gas reserves in Northern Montana. The development of 2 stimulation systems that is being used by most operators in South East Alberta developing shallow gas, this in addition to maintaining and developing oil production. I also pointed out that the Canadian Operations being placed back in the rate base, Cut Bank is the logical base of operations providing efficiency and least cost to the rate payer in Montana.

I questioned Percival's memo of April 27, 1982 where he states The reason of relocation is the possibility of S.E. Alberta pull out.

Finally I detailed health problems and asked Anderson how many people have been terminated for not accepting a transfer, and asked was there no compassion involved in light of the circumstances. Anderson replied quote "You know Percival he likes to put the knife in and twist it."

I am asking one months severance for each year of employment and intend to, if necessary, pursue this matter to the courts, Public Service Commission and media.

Yours truly,

s/ J.K. Finstad

(Emphasis supplied.)

13

Mr. Finstad testified that he talked to Mr. Anderson and Jay Johnson, his supervisor, about doing consulting work with MPC, and that he subsequently did consulting work on wells for MPC.

There was extensive cross examination of Mr. Finstad by the MPC counsel. With regard to the type of a job he did and the attempt by MPC officials to convince Mr. Finstad to move to Butte, he testified as follows:

Q    Nobody, Mr. Anderson or Mr. Percival, ever suggested to you that you weren't doing a good job, did they?

A    No, sir.

Q    That never came up, did it?

A    No, sir.

Q    Nobody ever suggested that they were firing you because you were doing a terrible job?

A    No.

Q    And, in point of fact, nobody ever said they were firing you, did they?

A    When Carl Anderson came--

Q    I'm asking you, did anyone use the word "fire" to you?

A    No, sir.

Q    And, at the time you met with Mr. Carl Anderson on June 2nd, 1982, did he criticize your job?

A    No.

Q    Isn't it correct that Mr. Anderson tried to convince you to move to Butte on June 2nd, 1982?

A    Yes, he did.

Q    And, you refused?

14

A     Yes, I did.

Q     Now, on June 2nd, 1982, you had been told that the office in Cut Bank, Montana was closing; is that correct?

A     Yes.

Q     Was the office closed?

A     Yes, it was.

Q     And, that was after June 2nd, 1982?

A     Yes.

Q     Has that office ever reopened?

A     No.

Q     In point of fact, they are, to this day, supervising drilling from Butte, Montana?

A     I assume so, yes.

Q     And, have been doing so since June 2nd, 1982?

A     I assume so, yes.

Because of the significance of Plaintiff's Exhibit 1, the memo from Mr. Percival, we will detail the cross examination of Mr. Finstad on that exhibit:

Q     Now, let's go though this line-by-line. "Effective July 1, 1982, supervision of all companies' drilling activity will be located in the Butte office." Did you read that?

A     Yes.

Q     Now, that says that effective July 1, 1982, all drilling activity will be located in the Butte office, is that correct?

A     Yes.

15

Q    Since July 1, has it been located in the Butte office?

A    I assume it has, yes.

Q    You know it has, don't you?

A    Yes.

Q    "Carl Anderson has visited with you on the subject and has requested that you move to Butte to assume your duties from this office." Is that a correct reading of that?

A    Yes.

Q    And, Mr. Anderson had, in fact, visited with you, hadn't he?

A    Yes.

Q    "As usual, I have not paid much attention to the title that goes with the job, but the job description and content initially will remain much the same as it is at the present time. " Is that correct?

A    Yes.

Q    And, you understood that?

A    Yes.

Q    And, you read that?

A    Yes.

Q    "Neil will remain in Cut Bank to handle what-ever part of the workload that is appropriate from that location."

A    Yes.

Q    Mr. Neil Van de Kop this is referring to, is that correct?

A    Yes.

16

Q    In fact, he did stay here and handle the workload?

A    I assume he did.

***

Q    "We will work out details of office space, communications, etc, required to serve Neil in Cut Bank prior to July 1st."  To your knowledge, were communications and office space worked out for Mr. Van de Kop?

A    I would assume they did.

***

Q    "You will report to the Chief Petroleum Engineer or Manager--Petroleum Engineering, who will in turn be reporting to Carl."  Any reason to doubt any portion of that?

A    No.

Q    "We are now working to fill that position and hope to have that done by July 1, 1982."  Did you know what they were doing in that respect?

A    No.

Q    And, that position was Manager of Petroleum Engineering?

A    Yes.

***

Q    "The reason for the relocation is the distinct possibility that we will be pulling out of southeast Alberta,"  I say southeast because it's SE Alberta, "and that our future drilling"--and, let's stop after southeast Alberta.  On April 27th, 1982, did you have any knowledge what Montana Power Company's plans were with respect to southeast Alberta?

A    The only plans that I was aware of were the current drilling plans which we were operating under at that time.

17

***

Q    Had you ever participated in any of the discussions about planning, long range planning?

A    Not directly, no.

Q    In your capacity out here as a Senior Engineer located in Cut Bank in charge of supervision--drilling supervision, you didn't play any role in that, did you?

A    No, sir.

Q    So, you didn't know what the plans were?

A    Right.

Q    Now, to the next paragraph, "I hope you will accept this transfer." That's what it says?

A    Right.

Q    Do you know what Mr. Percival hoped, do you have any personal knowledge what Mr. Percival, the author of this memo, hoped?

A    Nothing past that he hoped I would accept the transfer.

Q    Did Mr. Percival express that to you and try to talk you into accepting the transfer?

A    Yes.

Q    That's true, too?

A    Yes.

Q    Every indication is he hoped you would accept the transfer?

A    Yes.

Q    "I know it will broaden your experience beyond the field supervision level that you have done well for many years." Would you get different experience if you were located in Butte?

18

A    Not according to the plan they explained to me.

Q    Let's talk about when you received this. We'll get on with this.  If you would move to Butte and supervise from Butte, you would have been available to participate in various functions, a wider gambit than what you were doing here?

A    I don't know that.

***

Q    "Should you decide not to make the move, please let Carl know by June 1, 1982, so that he can plan accordingly."

A    Yes.

Q    Did you, in fact, contact Mr. Anderson on June 1, 1982?

A    No.  I didn't.

Q    Why not?

A    I don't remember.

Q    That was the only request that there was in this memo for you to do, is that correct, other than to relocate in Butte?

A    Yes.

Q    And, you didn't do either?

A    No.

Q    Now, was there any reason--and, I think I have discussed this and I want to make sure I get your answer, was there any reason you didn't comply with Mr. Percival's request to contact him by June 1, 1982?

A    It may have just slipped my mind.

Q    Did you hope it would go away?

A    No.

19

\*\*\*

Q     Did you write any memos or take any action to deal with this if this was a lie?

A     No, I didn't.

\*\*\*

Q     When you got this memo, did you make any decision with respect to this memo?

A     The decision I guess I made was that I was going to wait and talk to Carl and hope that something else might be available to me.  In fact, from the letter wherein it says just let him know.  I didn't have any idea I was going to be fired.

Q     And, I know you have said that and I appreciate that, go ahead and say it if you want, but you indicated to me you hoped Carl would do that?

A     Well, I had hoped I would be offered some alternative to this and I assumed I would be.

Q     Did you call Carl Anderson and say, I want something else?

A     No.  I didn't.

Q     Let's go back to this.  When you got this, did you decide then you weren't going to relocate to Butte?

A     I don't know.

\*\*\*

Q     From the main language, Mr. Finstad, and you're an intelligent man, from the main language of this, what's the alternative to not accepting the transfer?

A     I didn't know there were no alternatives.

Q     I'm asking you and trying to get your state of mind why you thought there were alternatives?  What are the alternatives to, "I hope you will accept this transfer."

20

A    I hadn't known of anybody ever getting fired for not taking it.

Q    What alternatives do you think you had available from this memo, to either accept the transfer or deny the transfer; is that correct?

A    Yes.

Q    This is pretty clear?

A    Yes.

Q    And, you refused to take the transfer?

A    Yes.

Q    Now, Mr. Finstad, have you ever represented to the Montana Power Company you were willing to relocated from Cut Bank, Montana; do you ever recall representing to the Montana Power Company, in any fashion, that you were willing to relocate to some other place other than Cut Bank, Montana?

A    No.

With regard to whether or not Mr. Finstad should have been allowed to stay in Cut Bank, he further testified on cross examination:

Q    Now, from the time you went to work in Cut Bank, Montana, until June 2nd, 1982, had anybody in the Montana Power Company hierarchy, and I'm talking about hierarchy, Jay Johnson, your immediate supervisor, right up to Joe McElwain, Chief Executive Officer of the Montana Power Company, did anyone ever tell you you would be able to retire in Cut Bank, Montana?

A    No.

Q    No promises to that effect were made?

A    No.

Q    No representations to that effect were made?

A    No.

Mr. Finstad's complaint alleged that MPC falsely informed him that they were eliminating his job assignment and position at Cut Bank for the reason that MPC was eliminating future drilling in southeast Alberta. As appears from the above factual quotations, MPC in fact did eliminate Mr. Finstad's job and position in Cut Bank, and completed all of the work from Butte. In addition, the uncontradicted evidence established that while not known to Mr. Finstad, MPC had negotiated for some time for the sale of all of its Canadian oil and gas properties and had negotiated a sale with all details agreed upon. However, that sale was not consummated because the proposed buyer backed out of the transaction at the last minute when the parties came together in New York City to execute the appropriate papers. The uncontradicted facts therefore establish that these particular reasons as stated in the plaintiff's complaint were not false as he alleged.

It is essential that we first focus on the conclusions which can be drawn from the uncontested facts. Following is a summary of significant facts based upon the uncontradicted evidence in the record:

1. That Mr. Finstad was an excellent employee with more than 22 years experience with MPC.

2. That MPC had chosen to close the Cut Bank office where Mr. Finstad had worked for many years and to transfer those functions to Butte.

3. That MPC did close the Cut Bank office and has continued to function without a person in Mr. Finstad's capacity in Cut Bank. The functions formerly performed by Mr. Finstad have been handled out of Butte.

22

4. That Mr. Finstad was offered a transfer from Cut Bank to Butte with the same job description and compensation.

5. That the transfer was first discussed with him by Mr. Anderson on April 14, 1982. Subsequently, by memorandum dated April 17, 1982, Mr. Percival clearly explained the transfer and concluded with the statement that he hoped Mr. Finstad would accept the transfer, that it would broaden his experience beyond the field supervision level and that "should you decide not to make the move, please let Carl [Anderson] know by June 1, 1982, so that he can plan accordingly." No response was made by Mr. Finstad by June 1, 1982.

6. That on June 2, 1982, Mr. Anderson met with Mr. Finstad and discussed the matter in some detail. Mr. Finstad understood that both Mr. Anderson and Mr. Percival desired that he accept the transfer.

7. That Mr. Finstad refused to take the transfer on June 2, 1982.

A key factual conclusion is that Mr. Finstad chose not to accept the transfer from Cut Bank to Butte. That is not in dispute. Notwithstanding his refusal to accept the transfer, Mr. Finstad contends that he was actually discharged. There are three basic contentions:

1. Mr. Finstad testified that if he had known there was no option other than accepting the transfer, he would have gone to Butte. In itself that is not substantive testimony. The record establishes that Mr. Finstad concluded that he was through when he was asked to turn in his keys and vacate the office. At that point Mr. Finstad had a clear choice. He could turn in his keys and vacate the office as he did. His alternative was to advise Mr. Anderson that he would accept the transfer to Butte if it meant that he was going to lose his job. There is a total absence of any indication on the part of Mr. Finstad that he was willing to do that. It would

23

have been a simple matter for him to have indicated that if it meant a loss of his job, he would of course accept the transfer. Mr. Finstad failed to do that. This leads to a key factual conclusion: it was Mr. Finstad who made the decision to terminate his employment with MPC. All MPC did was honor his decision.

Mr. Finstad's testimony establishes that he was in telephone and personal contact with various officials of MPC during the days and weeks following June 2, 1982. These afforded continuing opportunities for him to tell MPC that he had changed his mind and would accept the transfer to Butte. There is a total absence of evidence of such action by Mr. Finstad. We conclude that all of the evidence in the record, including the testimony on the part of Mr. Finstad, shows that MPC in fact did not discharge him. We conclude that starting June 2, 1982, and continuing for many days thereafter, Mr. Finstad had opportunities to accept the transfer and chose not to do so. This leads us to another key conclusion: the separation of Mr. Finstad from MPC was the result of his refusal to accept the transfer from Cut Bank to Butte.

2. Mr. Finstad points out that after 22 plus years of employment, he thought some other option or choice would be offered to him. The record establishes that the MPC handbook advised all employees of the possibility of transfer. Mr. Finstad's testimony established that he was aware of many transfers in the company. From our examination of the record we conclude that the record does not contain any evidence sufficient to establish that MPC was obligated to offer some other choice or option to Mr. Finstad.

3. Mr. Finstad argues that when Mr. Anderson asked him to turn over his keys and vacate his office on June 2, 1982, that constituted an actual discharge. As previously stated, Mr. Finstad refused to transfer with full knowledge that

24

there were no other options available to him. He terminated his own employment.

As further discussed in Part II of this opinion, in Frigon v. Morrision-Maierle, Inc. (Mont. 1988), 760 P.2d 57, 45 St.Rep. 1344, this Court pointed out that all of its decisions involving a covenant of good faith and fair dealing have been limited to instances of express employee termination or constructive discharge. In the present case, with the exception of the termination which occurred after Mr. Finstad's refusal to accept the lateral transfer which is discussed in detail in Part II, we conclude that the record does not contain facts establishing an express discharge or actual discharge.

Next we discuss whether Mr. Finstad was constructively discharged. This issue is more easily resolved. The basic question is whether the record establishes that by action or inaction, MPC has rendered the working conditions for Mr. Finstad so oppressive that resignation was his only reasonable alternative. See Niles v. Big Sky Eyewear (Mont. 1989), 771 P.2d 114, 118, 46 St.Rep. 504, 508. We note that a determination of constructive discharge must be supported by more than "an employee's subjective judgment that working conditions are intolerable." Snell v. Montana-Dakota Utilities Co. (1982), 198 Mont. 56, 65, 643 P.2d 841, 846. As described above, Mr. Finstad did testify that he thought it would be very difficult for him to perform his functions out of the Butte office. The record demonstrates that he argued over this point with his superiors, Mr. Anderson and Mr. Percival. From our careful review of the record, including this evidence, we conclude that Mr. Finstad failed to present any substantial evidence to demonstrate a constructive discharge.

25

We hold that the record does not contain substantial credible evidence to support a conclusion that Mr. Finstad was either actually or constructively discharged.

II

Does the implied covenant of good faith and fair dealing apply to termination following an employer's offer of a transfer of employment without change in compensation or other benefits where the employee refused the transfer?

In Frigon, Ms. Frigon contended that even though she had voluntarily resigned, she could raise the covenant of good faith and fair dealing as a tort separate from wrongful discharge and allow the Court to consider whether there had been a breach by the employer's refusal to give her performance and salary reviews and denying her a merit raise. In response to that contention, this Court held:

> All of the decisions of this Court involving a covenant of good faith and fair dealing have been limited to instances of express employee termination or constructive discharge. The appellant is correct in her assertion that breach of a covenant of good faith and fair dealing is a separate tort from wrongful discharge. The latter is premised on acts by the employer in violation of public policy, while the former is broader, and does not require a public policy violation. Dare, 687 P.2d at 1019-20. However, both Dare and Gates involved employee terminations. Breach of the covenant of good faith and fair dealing was established as a tort separate from wrongful discharge, but applicable only in cases of employee termination.

Frigon, 760 P.2d at 60. The Court concluded that Ms. Frigon had not been expressly terminated and had failed to establish facts to establish constructive discharge. The Court therefore affirmed the decision of the District Court in granting summary judgment to the employer defendant.

26

MPC argues that because Mr. Finstad's refusal to tranfer did not constitute either an express or constructive discharge, the covenant of good faith and fair dealing should not be applied. MPC argues that to apply the covenant to a transfer situation would make the courts a silent partner in the employment relationship. All transfers would become subject to review by the Court with potentially disastrous results for businesses.

Mr. Finstad argues that this case is not a transfer case because he concluded that he had been fired and therefore had received either an express or constructive discharge. That argument is disposed of by the preceding issue.

The key question is whether or not the refusal of Mr. Finstad to accept the transfer and the resulting termination of Mr. Finstad's employment by the taking of his keys, having him move out of his office, and terminating his salary, can be classed as an actual discharge for the purposes of invoking the covenant of good faith and fair dealing. We recognize that the termination resulting from the refusal to accept the transfer could be classed as a discharge, depending upon whether emphasis is given to the "quitting" by Mr. Finstad, or the actions of MPC in requesting that Mr. Finstad return his car and vacate the office. However, we conclude that a termination following the refusal to accept a lateral transfer does not constitute an actual discharge for purposes of invoking the covenant of good faith and fair dealing.

It is important that we recognize that the covenant of good faith and fair dealing was not intended to apply to all discharges in every type of employment. Our initial decisions in this area involved employment termination in which the covenant was invoked to protect the "at will" employee from an unfounded or biased discharge. However, for example, the discharge of an employee covered by a collective

bargaining agreement would not invoke the covenant. There may be other contractual relationships with a similar result.

In this case we conclude that a boundary should be established beyond which the covenant of good faith and fair dealing should not be applied. We conclude that it is not appropriate that the courts become involved in all employer-employee transactions such as transfers, promotions and demotions. We have previously emphasized that employers must have wide latitude and liberty in making business decisions. It is not the function of the courts to become the arbiter of all relationship decisions between employers and employees. We conclude that it is not appropriate to apply the covenant of good faith and fair dealing to the lateral transfer of an employee.

In accordance with Frigon we hold that the covenant of good faith and fair dealing may not be applied in the present case because of the failure of Mr. Finstad to prove an actual or constructive discharge. We hold that the covenant of good faith and fair dealing does not apply to a termination following the refusal of an employee to accept a lateral transfer of employment.

## III

As previously mentioned, the first question posed to the jury in the special verdict form was whether or not there had been a violation of the covenant of good faith and fair dealing. We suggest that in employment discharge and termination cases, if a special verdict form is used of the type herein set forth, it is essential that the jury be required to determine whether there was either an actual discharge or a constructive discharge. Those questions should be answered prior to any consideration of the covenant of good faith and fair dealing.

28

We reverse the judgment of the District Court and direct the entry of judgment for the defendant.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

29

Justice John C. Sheehy, dissenting:

Nothing is more clearly established in Montana law, that when a trial is by jury, all questions of fact are to be decided by the jury, and all evidence thereon is addressed to them, § 25-7-103, MCA; § 26-1-202, MCA; and that the jury is the judge of the effect and value of evidence addressed to it, § 26-1-203, MCA. Our State Constitution declares the right of trial by jury is secured to all and shall remain inviolate, Art. II, Sec. 26, 1972, Montana Constitution. Rule 38(a) Montana Rules of Civil Procedure is a declaration that the right of trial by jury shall be preserved to parties inviolate, in the application of the rules.

In reversing this hard-earned verdict, obtained by a faithful employee against the defendant company from a properly constituted jury, no error can be found by the majority, such as an incorrect instruction of law or an improper ruling of law made by the District Court. Rather, the majority assume seats in the now vacated jury box, and proceed to reverse the earlier jury on the facts.

The reversal is hinged on the majority's conclusion of fact which directly opposes the jury's conclusions:

> A key factual conclusion is that Mr. Finstad chose not to accept the transfer from Cut Bank to Butte. That is not in dispute. Notwithstanding his refusal to accept the transfer, Mr. Finstad contends he was actually discharged. (Slip opinion at 23.)

Whether Mr. Finstad refused to go to Butte was very much in dispute. The jury in this case decided that Mr. Finstad did not refuse a transfer from Cut Bank to Butte. On disputed testimony, the jury found that the actions of Carl

30

Anderson on June 2, 1982 constituted an actual discharge. At the least it constituted constructive discharge.

The test of whether an employee quit or was discharged is whether the employer's statements or actions at the time would reasonably lead the employee to believe that he had been terminated and that a formal discharge notice is unnecessary. 48 Am.Jur.2d 750, Labor, § 922.

The test of whether an employee is constructively discharged depends upon reasonable inferences that the employee could draw from the language used. NLRB v. Downslope Industries, Inc. (1982, CA 6), 676 F.2d 1114.

Whether Mr. Finstad quit or was terminated was a matter of hot dispute during the trial. The jury chose to believe Mr. Finstad. He testified as to the meeting of June 2, 1982 as follows:

Q Did you have any discussion with Carl Anderson concerning your productivity while you were driving from Butte to Cut Bank?

A I told Carl I couldn't accomplish much while I was behind the wheel of a car.

Q And, is that a fact?
A That's a fact.

Q Do you recall Mr. Fleming telling this jury that you would not agree with the decision of the Montana Power Company and chose not to be employed by it anymore?
A Yes.

Q Tell this jury when you chose not to be employed by the Power Company?
A I never did choose not to be with Montana Power.

Q You heard Mr. Fleming state that no one came into the office and said, You're fired.
A Yes.

Q What did happen?

31

A Carl came in that morning about 9:00 and sat down and told me that I would be moving to Butte. Once again, he told me that I would be doing the same things I had been doing in Cut Bank. I tried to point out to him that I just couldn't keep that pace up. I had recently gotten out of the hospital and I was devoting all of my time, as it was, to Montana Power. And, I just didn't think it was going to work and we talked for perhaps a half an hour and we neither were making any headway and Carl said, Well, I need to talk to Don Percival. [Percival was Carl Anderson's superior.]

Q Did you suggest that he do that?
A No.

Q Why did he tell you he needed to talk to Don Percival?
A I don't really know.

Q What were you trying to tell him would happen to the Power Company if they moved you to Butte?
A I was just simply telling him it wouldn't be efficient. I didn't see how I could run that operation out of Butte and drive the miles they expected me to.

Q In addition to what you were already doing?
A Right.

Q Then what happened?
Q I offered Carl the use of our local microwave telephone which is a direct hook-up to Montana Power's offices, and he said, No, it's a private call. And, I said, I could leave the room. And, he said, No. this is a private call.

Q Did he leave then?
A Yes.

Q And, how long was he gone?
A About 15 minutes.

Q And, when he came back, what happened?
A He came through the door and he said, Give me the keys to your company car, and he says, Turn in your credit cards, and he said, You can clean out your personal effects from this office.

32

Q  What did you say?
A  I said, You mean there aren't any alternatives to this?

Q  And, what did he say?
Q  And, he said, There are none.

Q  Did you say anything else?
A  I said, you know, Isn't there any compassion left in this Company?

Q  And, what did he say?
A  He said, Well, you know, when Percy puts the knife in, he likes to twist it.

Q  Then when Carl Anderson came into your office, demanded your credit cards, your key to the office and your car, and told you to clear out of the office, what did that mean to you?
A  Well, that was the end of my career.

Q  Did that mean you were fired?
A  Yes.

Q  Did you resign?
A  No.

Q  Did the thought of resigning ever occur to you?
A  Never.

The testimony of Carl Anderson, which the jury chose not to believe, is in substantial conflict with Mr. Finstad as to what happened at the meeting of June 2, 1982:

Q.  That brings us to on or about June 2, 1982, which this jury has heard an awful lot about. What took place on June 2, 1982 between yourself and Mr. Finstad. If you recall?
A  I had come to Cut Bank the night before and went to the office fairly early, 9:00 or thereabouts and told Ken the time has come and we are making a decision and this is the day we are doing it. We just can't drag it out any longer. He probably went through the same sort of things, the reasons he didn't want to come to Butte and my reasons why I wanted him to come, and it finally culminated in Ken and we just couldn't get to the point, this was it, so I said to Ken, If you are not going to move

to Butte, Ken, you may as well give me your car keys and forget about it. Prior to that he said, Well--now, I recall, Well, Carl, I am not going to move to Butte, so let me just clean up the odds n ends we have got going in Cut Bank and I'll stay here until the end of the month and close the office for you. And, I said, Ken, it isn't going to be any easier at the end of the month than today. And if you are not going to come to Butte, you might as well give the keys to me.

There is clearly a conflict in the testimony between the two principal protagonists as to whether Mr. Finstad refused a transfer to Butte. Mr. Finstad said he never refused, while Carl Anderson said he did. The jury resolved that issue of fact. Yet the majority states that Mr. Finstad chose not to accept the transfer from Butte and "that is not in dispute." It was the principal dispute of the trial.

The jury also relied on further evidence that Mr. Finstad was in fact willing to transfer from Butte, because he called a superior, Jay Johnson on the same day who told Finstad he would try to get him a job; he called Bob Rhodes and Bill Roberts, who are also supervisors, whom Mr. Finstad asked if they could give him any kind of help in getting his job back. Mr. Finstad further testified:

Q Did you tell any of these people after June 2, 1982, when you were trying to get a job with the Power Company, any of them, Jay Johnson, Robert Rhodes, Bill Roberts, Carl Anderson, Joel McElwain, any of them, that you would not move to Butte?
A No.

Q Did you in any way limit the location of your residence if you were permitted to return to work for the Power Company?
A No I didn't.

Finstad also testified that he was willing to reside wherever the Power Company would have asked him to reside without any exceptions.

34

In other testimony, Percival and Anderson testified that they never discussed with Mr. Finstad the extra travel he would have to undertake to perform his job in Northern Montana if he transferred to Butte; that one of the reasons he would not transfer was because of the health of his wife. Mr. Finstad refuted this testimony through his own evidence about the amount of travel, and the fact that the Power Company would continue to drill extensively in Northern Montana; that the supervision of an engineer was necessary for that continued drilling; and he produced his wife and their son each of whom testified that there was no objection on the part of the family to move into Butte for any reason. In fact Don Percival, the ultimate decision-maker, testified that Mr. Finstad never at any time told him that he would not move to Butte.

There are approximately 700 pages of testimony in this case not counting portions of transcript devoted to the settlement instructions and other matters. The majority have selectively used portions of the testimony to assert that there was no issue in this case of actual discharge or constructive discharge and the majority apparently contend that the jury had no substantial basis upon on which to render its verdict. The record is clear that there was indeed substantial evidence supporting the jury verdict and it should be maintained.

The further portion of the majority opinion respecting a breach of the implied covenant in cases involving lateral transfers or proposed lateral transfers is a gratuitous action by this Court not necessary to the decision and is therefore mere dicta. It would however be dangerous dicta if in the future it would be applied as a means for an employer to avoid liability for constructive discharge by a pretended lateral transfer.

I would sustain the jury verdict.

_____
John C. Sheehy
Justice

I join in the dissent of Justice John C. Sheehy.

_____
William E. Hunt
Justice

# CORRECTION

Date *April 3, 1950*

EDITORIAL DEPARTMENT
West Publishing Co., P.O. Box 3526, St. Paul, MN 55165

Please make the following correction in the opinion in the case of: *dissenting*

Title: *FINSTAD v. MONTANA POWER Co.*

Vol *785* Rptr. *P.2d* ~~857~~ Page *1387*

In ~~first~~ second column, line *5+6* from top ~~bottom~~.

" *implicable* "

*# 89-06*

should read

*implacable*

Signed *John L. Sheehy*

The expense of making changes is such that we cannot undertake it for items of merely typographical style.

West Publishing Co.

N182c